WALTER H. BAUM, petitioner-respondent,

*v.*

ERICH KORNBERG, defendant-appellant.

[Argued October 22d, 1946.    Decided January 17th, 1947.]

266

*Messrs. Major & Carlsen (Mr. James A. Major, of coun-*
*sel), for the petitioner-respondent.*

*Mr. Herbert J. Kenarik, for the defendant-appellant.*

The opinion of the court was delivered by

WACHENFELD, J.

The petition asked for an order restraining the defendant from taking his own son, Michael Paul Kornberg, an infant, out of the state and praying permanent custody be awarded to the petitioner. The defendant answered and filed a counter-claim seeking the issuance of a writ of *habeas corpus* commanding the petitioner to produce the body of the boy before the court and asking for his custody.

The advisory master decided the father should not be permitted to take the boy and made a decree giving permanent custody to the petitioner, suggesting the defendant be afforded reasonable and convenient opportunities for visitation. From this finding the father appeals.

The infant in question was born in Germany on October 2d, 1936. He was the only child of the defendant and his wife Irma, who died at the birth of her son Michael. The defendant married his present wife Gertrude on April 6th. 1938. From the time of their marriage and while they lived in Germany for about a year the second Mrs. Kornberg

mothered and had charge of the child and apparently they were very happy.

However, the menace of Hitler was rapidly overshadowing Germany and finally the inevitable happened and the defendant was incarcerated in a concentration camp. With the assistance of his relatives, including the petitioner, he succeeded in emigrating to this country, arriving here with his wife and child on March 9th, 1939. Although he had been a man of considerable means in Germany, he was stripped of his wealth and possessions by the Nazi regime and arrived here penniless except for some household furniture and about $12 in cash. The petitioner and his mother, the maternal grandmother of the child, met them and later they occupied a furnished room in New York City which had been obtained for them by the petitioner. Michael remained in the home of the latter. In November, 1939, the petitioner married and in 1941 he, his wife Rose, his mother Martha and the boy Michael moved to Teaneck and have resided there ever since. In 1942 the defendant and his wife moved to their present apartment in Brooklyn.

His occupation while in Germany was a textile salesman and here his first employment netted him $15 a week. His wife also obtained employment at $12 a week, first in a factory, then as a maid, and later in a millinery establishment. He gradually improved himself and is presently receiving a salary of $65 a week and a bonus of $200 or more, depending upon business successes. His wife quit her employment during the early part of 1944, intending to keep house and make a home for her husband and the child. At first they occupied one furnished room and were attempting to accumulate sufficient money to bring their parents here. They saved, borrowed and tried in every conceivable way to raise funds for this purpose and succeeded in collecting $500. The defendant then ascertained that his father had died and that his mother had disappeared. He therefore returned whatever money had been borrowed.

Heretofore, he had contemplated asking for the custody of his child but his mother-in-law, Mrs. Baum, became quite ill,

and fearing the effect this demand might have, he postponed making it until the month of June, 1945. This seems to be the first time the question in reference to the custody of the boy was raised. Up to then he had been living with the petitioner. When the defendant's desires were made known, the petitioner's wife informed him she was planning to go to California and intended to take the child with her.

Throughout the entire period the defendant and his wife saw the boy very often and had the child with them for weekends in their apartment. Frequently he accompanied them on their vacations. After the petitioner moved to New Jersey, the defendant continued to see his son at least once a week at the petitioner's home in Teaneck and the boy visited him in his apartment in New York for week-ends. Friction arose between the petitioner's family and the defendant's second wife, and according to her version she was not allowed to visit the Teaneck home. However, she saw the boy when he came to their New York apartment. They sent the boy birthday and Christmas gifts and his stepmother says she continually bought him things he loved and wanted to have.

About two years after their arrival in this country the defendant started to pay regularly for the board of his son. At first these payments were only $2 or $3 a week, but as the defendant's salary increased, the payments likewise increased until they amounted to $10 a week.

There is no contention by the petitioner that the defendant and his wife are unfit to have charge of the boy or that their home environment would not be conducive to the boy's happiness and welfare. On the contrary, the defendant and his wife are refined and intelligent and the petitioner does justice thereto despite his anxiety to retain custody of the child. Equally complimentary, the defendant admits the petitioner has given to his son Michael a fine home, a good education, and that there has been bestowed upon him the attention and affection a boy would receive from his natural parents.

The rule of law is clear and has been enunciated many times: the welfare of the child is of paramount importance but the right of the parents is also to be considered. The

difficulty, if any, in cases of this kind is its application. In *Ziezel* v. *Hutchinson, 91 N. J. Eq. 325,* speaking of the right of a parent to his child as against that of grandparents, the court said:

"\* \* \* and in the absence of satisfactory proof of parental unfitness, the child in compliance with the inexorable legal mandate, must be awarded to her father."

And again in *Richards* v. *Collins, 45 N. J. Eq. 283:*

"Doubtless it is the strict legal right of parents and those standing *in loco parentis* to have the custody of their infant children as against strangers. This right will control the judgment of the court, unless circumstances of weight and importance connected with the welfare of the child exist to overbear such strict legal right.

"The court will not regard the parental right as controlling, when to do so would imperil the personal safety, morals, health or happiness of the child. In determining this delicate and often difficult judgment, the court looks at the character, condition, habits and other surroundings of claimants."

Again in *In re A. B. M., 132 N. J. Eq. 434,* it was held the interest of the child was controlling and not the parental right, and in *In re R. L., 137 N. J. Eq. 271,* the court said:

"\* \* \* The natural and legal rights of the parent must, of course, be contemplated, but the subject of paramount consideration undoubtedly is the welfare of the child."

Guided by these rules we are unable to agree with the result reached by the advisory master. The court below, after quoting *R. S. 9:6–1,* the statutory provision reciting that a child is abandoned where it is willfully forsaken, found that the defendant, the father of the child, had manifested a settled purpose to forego all parental duties and to relinquish all parental claims. This conclusion, in our opinion, is not supported by the testimony. The intention of the father in reference to leaving the child with the uncle and the grandmother is best expressed in his own way:

"Question: You think it was also an obligation on the Baums to keep Michael for a period of over six years?

Answer: At that time, no one was thinking about days to come. We just arrived in this country penniless, persecuted as Jews in Germany and we are glad to be here and the family Baum was glad also to help us  *  *  *  she was glad I was home again and that it means as much to her as to me and it is still the same to-day, that same feeling."

When the father arrived in this country he was a stranger in a strange land, unacquainted with its customs and ways, with many obligations, cares and worries. He was torn between the love of his son and the obligation to his parents, who were being subjected to the hatred and brutality then rampant abroad. The child could be taken care of by willing relatives and the father thus would be able to direct his efforts toward the release of his parents, who were in imminent danger.

Although the child was in the uncle's home, his father's devotion was manifest throughout. He made frequent visits, constant inquiries, and assumed the support of his child as soon as he was able to do so. There was nothing in the father's conduct or utterances indicating an intent to abandon his boy. Fleeing from his native country, suffering the resultant hardships and humiliations, braving financial destitution, were all endured so that his son could have the advantages of life in a free country with free enterprise, without discrimination and persecution. It would have been strange had he deserted the one for whom he fought after the fight was won.

In *Starr* v. *Gorman, 136 N. J. Eq. 105,* this court said:

"Grandparents are not entitled to the custody of an infant as against the natural father, who has shown no intent to abandon his offspring and who, from his past conduct, may be expected to bring up the child in accordance with his means and station in life."

Nature in her indefinable way cements the union of parent and child as evidenced by their mutual affection and reciprocal bonds of love and esteem, and there should be no breach of nature's intendment unless the welfare of the child demands it. In this case the home environment and the status of the

parents are conducive to the boy's happiness and well-being and his interest, we think, will be served best by his father.

The decree below is reversed, with costs, and the cause remanded with direction that a decree be entered in accordance with this opinion.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, PARKER, BODINE, DONGES, HEHER, PERSKIE, COLIE, WACHENFELD, EASTWOOD, RAFFERTY, DILL, FREUND, McGEEHAN, McLEAN, JJ. 14.