This controversy concerns the custody of two female infant children of about two and four years of age, respectively. The children are in the custody of their maternal grandfather, David O. Evans. The writ of habeas corpus was issued at the instance of Joseph W. Alsdorf, the father of these children, and he seeks their custody and their removal from the home of the grandfather at Holmdel, Monmouth County, *Page 247 
New Jersey, to his (the father's) home in Mt. Vernon, New York. The controversy arises out of the following facts and circumstances:
The petitioner, the father of these children, married the only daughter of the defendant David O. Evans, in 1942. Her mother died when she was seven months old and she was brought up by her father in the home of her grandmother, and there was a strong bond of affection between the father and daughter. She married the petitioner, Joseph W. Alsdorf, against her father's wishes and her life with him was a rather hectic one; primarily, I believe, because he was unsuccessful in business and was always short of funds, as a result of which she was obliged frequently to call upon her father for help, which he always generously supplied. There is evidence, however, over the petitioner's own signature, that during his married life with the defendant's daughter, he had affairs with other women; but it was not shown that his wife was cognizant of this fact, and there is no doubt but that she was loyal to him until the last. He had a criminal record at the time of his marriage, having been convicted of forgery and larceny in 1939, for which crime he was sentenced to one year in the county jail of Nassau County, New York, and apparently served out his sentence. In 1946 he was again in difficulties and was charged with having embezzled $1,500. The facts touching this episode are best stated in the opinion of Judge Anson W.H. Taylor of the Court of Probate, District of Greenwich, Connecticut, filed by him on an application of the defendant for removal of the father as natural guardian of his children, as follows:
"The culmination came in May, 1946, when the mother of these children, taking her husband with her, went to her father's home to obtain $1,500 to prevent the conviction of the father of embezzlement or larceny on charges lodged in Yonkers, New York. At a long interview, first with his daughter and subsequently with his son-in-law, Mr. Evans finally agreed to let his daughter have a short-termed loan of $1,500 which would be repaid to him within a very short period out of the accounts receivable which were due to be collected. This was a Thursday evening and the next day *Page 248 
he sent his daughter a check on a New Jersey bank for $1,500. The following Monday, May 20th, Mr. and Mrs. Alsdorf negotiated with the District Attorney at Yonkers for settlement by payment of the $1,500 against the withdrawal or cancellation of the criminal proceedings. The request was made that the check be certified. Mrs. Alsdorf took it to New Jersey and had it certified. The following morning, May 21st, at the office of the attorney for the creditor, she exhibited the certified check made to her order but refused to indorse it until the withdrawal of the complaint and cancellation of the criminal proceedings were presented to her. While someone was in transit to obtain these papers, she was taken with a seizure and died.
"It is quite obvious from this history that the feelings between the grandfather and the father of these children are irreconcilable. The certified check in question was deposited in the estate of the deceased mother and the day after the first hearing in this proceeding, on some assurance to the creditor and the District Attorney and a judge in Westchester County that the funds were deposited in the mother's estate, the criminal proceedings were withdrawn and canceled, so that to-day this father has no criminal proceeding pending and the only criminal record actually existing is ten years old."
Immediately after the mother's death, Mr. Alsdorf contacted a Mrs. Beatrice M. Fink, a friend of Mrs. Alsdorf's, who was then in Florida, and who immediately came to Mount Vernon, New York, and took custody of the children at Mr. Alsdorf's request. She testified that Mr. Alsdorf threatened to put them in a foster home but finally agreed to her taking them and agreed to pay for their support. She took them with her to a small apartment which she rented in Greenwich, Connecticut. At that time the younger child was five months old and the elder child one and one-half years of age. Mrs. Fink testified that she received two checks from Mr. Alsdorf in payment for his children's support, both of which were protested, and as a result of which she was without funds to buy food for the children. I do not place too much reliance upon her testimony as it is evident that *Page 249 
she was imbued with that "fury" for which the "woman scorned" is famous, and she exhibited a very vindictive attitude toward the petitioner while she was on the witness stand. A letter written to her by Mr. Alsdorf and produced by her and offered in evidence, as Exhibit D-14, and the writing of which he acknowledged, indicates that he had previously had "an `affair' of long standing" with her. However, it appears that the children remained with her until early in August, 1946, when she claims that she could no longer support them, could not get in touch with Mr. Alsdorf and called the local police in Greenwich, Connecticut, who contacted the defendant, the grandfather of the children, informed him that they were starving, were not being supported by their father, and asked him to come to Greenwich, Connecticut, and assume their custody. He told them he would be glad to do so providing he could get a court order giving him the necessary authority. He was advised that that could be arranged, whereupon he went to Greenwich, Connecticut, and he and Mrs. Fink joined in an application to the Probate Court for an order removing the father as the children's guardian and committing their custody to the defendant. Such an order was made on August 9th, 1946, by Judge Taylor. The physical condition of the children at that time was deplorable. The younger child, although then seven months old, weighed less than 11 pounds and the older child was seriously ill. The defendant-grandfather took them to his home in Elberon, New Jersey, called a doctor and a trained nurse and had the older child removed to a hospital, where she was treated for some time and later returned to the defendant's home in Elberon. The children remained there until the fall of that year, when they were taken by the defendant to his 600-acre farm in Holmdel, Monmouth County, New Jersey, and where they have resided ever since, except for the summer months when they were taken to the defendant's summer home at Elberon, and except for a short time when they lived at another winter home maintained by the defendant at West End, New Jersey. Shortly after the custody of these children was committed to the defendant-grandfather, Mr. Alsdorf, the father, applied to the Court of Probate at Greenwich, *Page 250 
Connecticut, for a revocation of that order, and after a two-day hearing, and on September 5th, 1946, the order was revoked by Judge Taylor who made it in the first instance, he finding that there had been no abandonment, that there was not sufficient evidence of mistreatment of the children to justify his removal as their natural guardian, and, in his opinion, concluding as follows:
"However, as indicated above, I can find no grounds at the present time, for removal of this father and I doubt that the temporary residence of these children for four weeks in the jurisdiction of this court would warrant further proceedings here. The children are now located in New Jersey with their grandfather. The legal residence of the children and that of their father is in Westchester County, New York. If there is to be further litigation other than an appeal of this decision, I am confident it will have to be in either New Jersey or New York courts. I am therefore executing an order as above indicated terminating the temporary guardianship."
From the order of the Probate Court of Greenwich, Connecticut, on September 5th, 1946, revoking the previous order of August 9th, 1946, an appeal was taken to the Connecticut Superior Court, which appeal, I am advised, remains undisposed of. However, I am also advised that such appeal does not stay the revocation of the previous order appointing the defendant as temporary guardian of these minor children.
It is conceded by counsel for the defendant that the father of these children has a common law right to their custody, and that this court is obliged to enforce such right unless the father has abandoned the children, has forfeited the right to their custody by his conduct, or is unfit, morally or otherwise, to exercise parental custody over them. The defendant rests his claim to the custody of the children upon the alleged unfitness of the father to assume such custody.
For a clearer understanding of the father's background, and for a proper determination of his fitness to assume the custody of the children, some further facts should be stated:
It appears by an exemplified copy of the records of the Supreme Court of New York, Nassau County, that the father of these children was married previously to his marriage with *Page 251 
the defendant's daughter, to one Hilda Gellrich by whom he had one child, a daughter, who is now living, in the custody of her mother and apparently about 15 years of age. The mother of that child obtained a decree of divorce from him on October 15th, 1941, on the grounds of his adultery, and by that decree he was ordered to pay to her the sum of $13 per week for the support of his minor child of that marriage, until September 14th, 1942, at which time such payments were to be increased to the sum of $15 per week, and to continue until the child should "attain her maturity." The former wife testified at the final hearing. She was a woman of much refinement and a school teacher by profession. She testified, and I believe her, that the defendant has completely ignored the court's order for the support of his minor child by that marriage.
There was also offered in evidence an exemplified copy of the record of the petitioner's conviction and sentence for forgery and larceny in 1939, referred to in the opinion of Judge Taylor of the Connecticut Probate Court.
Also offered in evidence, were exemplified copies of the records of ten civil judgments against the complainant, the father of these children, aggregating approximately $9,000, which judgments are still open of record. It appears further that Mr. Alsdorf, since his second wife's death, and on June 7th, 1947, a little over a year after his second wife's death, married one Dorothy D. Feldman, who, I believe, prior to the death of the mother of these children, had some business relations with him and to whom at that time he owed over $3,000. This debt, as I understand from the testimony of his present wife, was canceled upon their marriage. In the letter (Exhibit D-14) already referred to, there are references to "my break with Feldman (who incidentally was further angered when she learned we have had an `affair' of long standing)," which raises the question as to the extent of his relations with her prior to their marriage. The inferences to be drawn from the contents of this letter are plain, but I make no accusation against the writer — he is his own accuser and if thereby he besmirches the character of others the responsibility is his alone. *Page 252 
Mr. Alsdorf claims now to be employed at a salary of $100 per week. There is no proof to the contrary although his present wife, who seems to be his business manager, refused to tell counsel where he worked or by whom he was employed. She said, however, that she would give this information to the court privately, but neglected to do so. She is presently employed five days a week at $65 a week and proposes to give up that position to take care of the children if their custody is awarded to the father. It appears from the testimony of other witnesses that the father still occupies an apartment, possibly the same apartment which he occupied before the death of the mother of these children, in an apartment house in Mount Vernon, New York; and that it contains the same furniture which was in use at the time the children were born. And it would appear that that apartment is entirely suitable to his station in life and under ordinary circumstances would be a proper home for the children.
On the other hand, it appears that the defendant-grandfather is a reputable and prosperous business man, engaged in the general contracting business. He is undoubtedly a man of parts and of considerable means. He owns and maintains three homes — the farm in Holmdel, the winter home in West End, a summer home in Elberon, and also an apartment in Hillside, New Jersey, in which municipality his business office is located. These grandchildren are his only descendants and his prospective heirs. It is undoubtedly a fact that he has expended large sums for their care and maintenance and is willing to sacrifice much for their welfare. His home at Holmdel, and also at West End and at Elberon when those homes are open, is presided over by a capable couple employed by him, who, together with a trained nurse employed by him, apparently take good care of the children.
It is in the light of the facts and circumstances above detailed that the difficult question touching the custody of these children must be determined.
The law applicable to this controversy is not is dispute. The present application is addressed to the inherent jurisdiction of the court. It is undoubtedly the law that unless the father of these children has waived or forfeited his parental *Page 253 
right to their custody, or unless he is morally unfit or financially unable to properly care for them, he is entitled to their custody although it might well be that it would be greatly to their advantage if they could remain at the home of their maternal grandfather. Warnecke v. Lane, 75 Atl. Rep. 233; Exparte Kirschner, 111 Atl. Rep. 737; Starr v. Gorman, 136 N.J. Eq. 105; Ziezel v. Hutchinson, 91 N.J. Eq. 325; Baum v.Kornberg, 139 N.J. Eq. 265; In re Judge, 91 N.J. Eq. 395;Richards v. Collins, 45 N.J. Eq. 283; Giffin v. Gascoigne,60 N.J. Eq. 256. And as opposed to the claim of the father, the grandfather occupies the position practically of a stranger.Warnecke v. Lane, supra. But, of course, in habeas corpus
proceedings the controlling consideration is the interest of the children. Ex parte Kirschner, supra; In re A.B.M., 132 N.J. Eq. 434; In re R.L., 137 N.J. Eq. 271; Richards v. Collins, supra.
In Ex parte Kirschner, supra, Vice-Chancellor Stevenson said:
"Our law gives no court the power to award the custody of a child away from its parents or parent, unless the parental right to custody has been transferred or abandoned. The child of a laborer may be lost and be taken into a home of refinement and luxury, where it is accepted by persons who are willing to adopt it and give it education and fortune. The laborer upon the discovery of his child may regain its custody by a writ ofhabeas corpus without regard to the child's wishes, and bring it up in the station in life in which it was born. No court has power to thwart and disregard the unabandoned, untransferred parental right, although it may be evident that the best interests of the infant would be promoted by giving its custody to the stranger."
In that case Vice-Chancellor Stevenson also said that the parental right is a "right which should be touched with an extremely cautious and gentle hand."
However, from the later cases, of which In re A.B.M., In reR.L., Starr v. Gorman and Baum v. Kornberg, supra, are examples, it would seem that the welfare of the child rather than the parental right is the controlling element in a controversy such as that here involved; and especially can *Page 254 
it be said of this case, as was said by Vice-Chancellor Stevenson in Warnecke v. Lane, supra:
"This is not a case where the Court of Chancery is bound to recognize and enforce the common-law right of the father, without regard to the interests of the infant children."
In such cases the Chancellor exercises a general jurisdiction over the custody of the person of infants (In re Barry, 61 N.J. Eq. 135), and,
"The infant's welfare, all matters considered, is paramount and compelling in the eyes of the Chancellor as parens patriae." Inre Judge, supra.
In the case last cited, Vice-Chancellor Backes, at page 397
of the report, said:
"If in a contest as here, between a parent and a stranger in possession, for the custody of an infant of tender years there is equality as to character, condition, habits and surroundings of the claimants, the natural right will prevail; mere material advantage to the child will not count against the inherent right. The strict legal right will not be subordinated unless circumstances of weight and importance connected with the welfare of the child exist to overpower it, and these circumstances must be such as to imperil the personal safety, morals, health or happiness of the child."
But, as was well said by Vice-Chancellor Jayne in In re R.L.,supra:
"A child cannot be regarded in the law as a mere inanimate chattel. The rights of the parent must not be permitted to obliterate the rights of the child."
The solicitor of the petitioner-father calls my attention to the fact that in the proceedings before Judge Taylor in the Connecticut Probate Court he found that the father had not abandoned his children and was not unfit to have their custody; and it is argued that such determination is final and conclusive on this court, and that only facts or circumstances occurring since that decision should be considered in determining the father's present fitness or unfitness to assume the custody of these children. I cannot accede to that argument. The trial here under this writ is de novo, and my decision is not in any way controlled by that of the Connecticut Probate Court, because the jurisdiction of the Chancellor as *Page 255 parens patriae cannot be thereby limited or restrained. In this connection, it should be borne in mind that there were many witnesses examined before me who did not testify in the Connecticut court, and there was much evidence introduced before me that was not considered there. For instance, there is nothing in Judge Taylor's opinion which suggests that he had any knowledge whatever of the petitioner-father's first marriage and divorce, or of his failure to support the child of that marriage as directed by the court in which the divorce was obtained. These facts and others which were put in evidence before me, but were not before Judge Taylor, might have changed his opinion as to the father's fitness. It is noted that in Judge Taylor's opinion he mentions the fact that the father's conviction of forgery and larceny in 1939 was based on a transaction or a series of transactions which "occurred ten years ago," and that he also said "that to-day this father has no criminal proceeding pending and the only criminal record actually existing is ten years old." The conviction was eight years prior to the hearing before the Connecticut court, but that the criminal instinct in the father was still present at the time of that hearing is clearly shown by the fact of his embezzlement which resulted in his second wife's death. There is no claim of the father's innocence of this charge, and the fact that there was then, and is now, no "criminal proceeding pending" against him is, under the circumstances, of no moment whatever so far as the issue of his present fitness is concerned.
I realize that the legal rights of the father to the custody of his children should not be here lightly dealt with (Ex parteKirschner, supra), but I am not convinced that he has sufficiently divorced himself from his old habits as to justify this court in committing the custody of these children to him, or that if such custody were granted to him, they would not be subjected to influences "such as to imperil" their "personal safety, morals, health or happiness" (In re Judge, supra). What assurance have we that he will not shirk his duty to support and care for these children if their custody is awarded to him the same as he did the duty to his first born? None, in my opinion, that can be relied upon. And besides, in view of his large indebtedness represented by the judgments of *Page 256 
record, and the possibility of the enforcement of the court order for the support of the daughter of his first marriage, which would entail an expense of $780 a year, where will he get the money for their support and maintenance? Judge Taylor, in the Connecticut proceedings, without any knowledge of these additional obligations, questioned his ability to support the children without help from the defendant-grandfather.
As to the moral influences which might "imperil" these children, we need refer only to his past record and the letter,Exhibit D-14, written by him within a very short time after the death of the mother. That letter is a perfect mirror reflecting his true character and the implications and justifiable inferences to be drawn from its tone and content are anything but favorable to him. The award of the custody of these infants to the father would, in my judgment, greatly "imperil" their "personal safety, morals, health or happiness," and his application should be and will be denied.
I am of the opinion that the "paramount and compelling" interest in the children's welfare demands that, for the present at least, they remain in the custody of the defendant-grandfather, subject, however, to the right of reasonable visitation of the father. During the course of these proceedings the grandfather several times expressed himself as perfectly willing that the father should have access to the children and should be allowed to visit with them at all reasonable times, and I am convinced that satisfactory arrangements for such access and visitation may be amicably arranged between counsel for the respective parties; but if not, that matter may be submitted to the court for determination.
"Changes of circumstances may at any time occur which will make it proper to give the father the general custody of his children. The order will contain appropriate reservations which will make it possible for either party to apply to the court for a modification or radical change of the order which will now be made." (Warnecke v. Lane, supra.) But before any such change is made the father should serve a considerable period of probation and demonstrate by his actions and conduct that he is a proper person to have their custody.
I will advise a decree in accordance with these conclusions. *Page 257