## JUNE TERM, 1871.

McLaughlin, appellant, and McLaughlin and others, respondents.

1. A widow who remains in the possession of the mansion-house cannot be required to account for the rent of such house in case she claims damage for the detention of her dower in the other lands of her husband.

2. In partition, where the widow consents to take a gross sum in lieu of dower, and then dies, the fact of her death cannot affect the valuation to be made of her interest in the lands. It is her expectancy which is to be valued, and not the actual value of her life estate as it has turned out to be

3. The right of the widow becomes vested by her consent, and her subsequent death cannot affect such vested right. The case of *Mulford* v. *Hiers*, 2 *Beas.* 13, followed.

4. *Held*, in this case, that at the time the widow agreed to take a gross sum, her life was of the value of the average of persons of her age in ordinary health, and that a decree must be made on that basis.

John G. McLaughlin died, intestate, on the 2d of May, 1861, seized of a number of houses and lots in Jersey City, in one of which he resided at his death. He left his widow, Abby Ann McLaughlin, and six children, his heirs-at-law.

Two of these children were minors at his death. Some of them were children of his widow, the others were children of his wife. The widow remained in possession of the mansion-house until her death on the 20th of August, 1868. Dower was never formally assigned to her. The administration of the personal estate of her husband was granted to her. By tacit consent of all the heirs who were of age, she assumed the management of the real estate, collected the rents, paid the taxes and repairs, and rented out such parts as it was necessary to rent.

The bill in this case was filed in the lifetime of the widow, for a partition, and for an account by her of the rents of the estate. The master reported that a partition could not be made without great injury, and that the property should be sold, and that the dower of the widow should be sold with the lands. The lands were all sold in the life of the widow, and all conveyed except one lot in Greene street, which, upon the refusal of the purchaser to comply with his contract, was ordered to be re-sold, and was re-sold after her death. On the 23d of June, 1868, the widow filed her petition, electing to accept a gross sum in lieu of her dower, and an order was made on July 7th, 1868, to refer it to the master to ascertain and compute the value of her dower. She had, in compliance with an agreement between the parties during the progress of the cause, rendered her account of the rents and profits of the estate, in which she charged five per cent. for collecting them, and claimed one-third as due

to her in her right of dowress, but did not charge herself with the rent of the mansion-house, and the office on the adjoining lot, which had been occupied as such by her husband in his lifetime. It was also referred to the master to examine and state her account.

The master made a separate report upon each order of reference to him. In the report upon the order to state the account, he charged her with the value of the mansion-house from the death of her husband, or rather from May 1st, the day before his death. To this the complainant, as executrix of her mother the widow, excepted, claiming that as dower was never assigned, the widow was entitled by virtue of the statute, to remain in possession of the mansion-house and messuage attached, without rent, until dower was assigned.

The opinion of the Chancellor is reported in 5 *C. E. Green* 190.

*Mr. W. A. Lewis* and *Mr. B. Williamson,* for appellant.

*Mr. Dixon,* for respondents.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

By the decree in the Court of Chancery, the widow of the intestate, whose property it was the object of this bill to partition, was charged with the rent of the mansion-house. It appeared in the case that, from the time of the decease of her husband to the period of her own death, which occurred pending this cause, Mrs. McLaughlin was in the possession and actual occupation of the house in which the intestate was living with his family at the time of his death. By the second section of the act relative to dower (*Nix. Dig.* 250), it is provided that until her dower be assigned to her, it shall be lawful for the widow to remain in and to hold and enjoy the mansion-house of her husband, and the messuage or plantation thereto belonging, without being liable to pay

any rent for the same. The question then arises, is there anything in the facts of the present case which should deprive Mrs. McLaughlin of the privilege thus conferred on widows as a class?

The first ground of exclusion insisted on was, that, in point of fact, there had been an equitable assignment of dower. But the proofs, in my opinion, altogether fail to sustain this assumption. The facts were these : Upon the death of her husband, the widow remained in the homestead, and also took possession of the other houses which constituted the remainder of the real estate. She received the rents of these houses, and, from time to time, paid over two-thirds of such rents to the children of her husband. She paid no rent for the homestead, nor was any ever demanded of her. It does not appear that the subject of rent for the homestead was ever alluded to between her and the children. She lived there free of rent, and in her testimony in this case, she says she supposed she had the right so to do. From these circumstances, it does not seem to me possible to hold that, as an equitable inference, we are to understand that the widow and heirs intended that the former should take one-third of this homestead, and should account for the other two-thirds in the form of rent. The facts of the case are all opposed to such an implication, and the widow expressly testifies that she had no such understanding. Some of the heirs have been sworn, and they do not pretend that they had a different impression. The entire question is as to what was the intention of the parties to this transaction. The widow says she occupied rent free ; that she supposed she had the right to do so; and no one contradicts either the fact, or her understanding of the affair. I am constrained to dissent from the conclusion that, from these circumstances, the equitable inference is that dower was actually assigned in the mansion-house to the widow, and was accepted by her. To the contrary of this, the proof seems to me to be clear that it was the understanding of all the persons interested, that the widow should occupy this house free of rent.

But in the second place, the broad position is taken that, conceding no equitable assignment to have been made, still, the widow, as she claims one-third of the rents of the other lands, must account for the value of the part occupied by her.

After a careful consideration of the subject, I am satisfied there is no foundation for this doctrine. In my apprehension, it is clear that if this be the rule of law, this important provision of the statute in favor of the widow will, in many cases, be of no avail to her. By force of such a theory, it would be advantageous to her only in cases where her husband left no real estate besides the homestead. Nor do I perceive anything either in this statute, or in the general rules of the common law, out of which such a doctrine can be constructed. The statute certainly has no such aspect; its language is clear that the widow shall hold the mansion-house, &c., until her dower shall be assigned to her, free of rent. The privilege is given here in the most unqualified form. The proposition is, to annex to this grant a condition to this effect; that the widow shall pay no rent, provided she makes no claim to her dower in the other lands which her husband owned. Upon what principle is it that this clause is to be deprived of half its force? The purpose of the act is obviously to provide a home for the widow until her dower be assigned, as well as to put a compulsion on the heir to make the assignment. To require the widow to sacrifice to the extent of two-thirds of the rental value of the homestead, her dower in the other lands of her husband, would defeat, in many cases, both these purposes; for, in case the dower thus abandoned was equivalent to the rent of the homestead, she would gain nothing, and the heir would lose nothing, by her remaining in its occupation. The hypothesis in question appears to me opposed, as well to the purpose and spirit of this law, as to its language. Nor have I been able to harmonize it with any of the rules of practice on the subject of dower, or with the general principles recorded in the decisions. It was provided by Magna Charta, that "the widow

should tarry in the chief house of her husband for forty days;" and it is clear from the books, that after the statute of Mer-ton, which gave the widow damages for the detention of her dower, the widow was not required, when she made claim to dower in the other lands of her husband, to bring in and account for the value of the premises thus occupied by her during her quarantine. There is nowhere, as far as I have discovered, a suggestion of such a liability. And it is also to be observed, that there was no express declaration in the Great Charter that during her forty days the widow should be exempt from the payment of rent, but this result was im-plied from the provision, that she should have reasonable estovers or maintenance out of the estate. 4 *Kent's Comm.* 61; *Co. Litt.* 124 *b.* The clause of our act is but an amplifica-tion of this provision of Magna Charta, beneficially extending the term of the widow, and expressly declaring that she shall hold the premises free of rent. If, then, it is true, as I un-derstand it is, that the widow, in the estimation of her dam-ages, was not charged for her occupation of the homestead during her quarantine, it would seem to be out of the ques-tion to charge her for possession of the mansion-house by force of our statute. It is true that at common law, there were certain reprisals which were made from the damages of the widow, and among these sometimes was included a de-duction on account of her occupation of some part of the property. I have no doubt of the propriety of such deduc-tions. Their legitimate extent, however, appears to have been this : whatever part of the property the widow had been in the actual enjoyment of, was thrown out of the esti-mation of damages, and on the simple ground that from such property she had not been deforced of her dower. But this rule merely excluded the claim of the widow to recover the value of her thirds in the land during the time she had so occupied it; but it did not authorize the heir to set up a counter claim in the suit for dower, for the other two-thirds of the value of the premises so having been occupied. If the widow had occupied the land without the assent of the heir,

she was a mere trespasser, and it was not competent for him, in the action of dower, to set off the damages thus sustained; and if, on the other hand, he had consented to such occupation, he had his action to call the widow to account. But in the action of dower, the effect of the enjoyment of the land by the widow was to estop her from saying that in such land she had been deforced of her dower, and on that account to claim damages. So whatever had been paid to the widow in part satisfaction of her dower, could be shown in mitigation of damages. This, according to my understanding, is the entire scope of the decisions and judicial intimations. The cases cited fall within this circumscribed rule. *Woodruff* v. *Brown*, 2 *Harr.* 246; *Keeler* v. *Tatnell*, 3 *Zab.* 62; *Hopper* v. *Hopper*, 2 *Zab.* 715. In the case of *Nevill* v. *Walker*, 1 *Leon.* 861, there was a judgment by default, and the widow, by force of it, had her dower assigned, and subsequently, on a writ of inquiry, the jury, instead of estimating the damages to the date of the assignment of dower, by mistake, embraced the period between that time and the taking of the inquisition. The decision was to the effect that the widow could not claim damages for that portion of the time she had actually been in the enjoyment of her dower under the judgment of the court; a decision which certainly has no bearing upon the question under consideration. But I further remark, that even if it had appeared that, by the principles of the common law, a deduction was to be made from the damages to be awarded to the widow, to the full value of the lands occupied by her, it would not have shown that such course was proper under the operation of our statute. The effect of the rule would have been to make her pay full rent for the land occupied by her; but our statute declares that she shall not be charged with the rent of the homestead. To apply, therefore, such a rule to the widow's occupation of the "chief house of her husband," would be to expunge the statutory provision.

I think, from these considerations, that the widow could not be charged with any rent for her occupation of this man-

sion-house. The decree should be corrected in this par-
ticular.

And it also seems to me that the second exception to the
decree is well taken.

The widow elected to have a gross sum in lieu of her
dower. After making this election, and before its value had
been ascertained, she died. The master, in estimating the
sum that should be allowed the representatives of the widow,
considered and acted on the idea that the value of her life
was settled by its actual duration. The Chancellor held
that this calculation rested on an erroneous principle. The
fact is, the master appears to have misapprehended the
nature of the interest or thing which the widow agreed to
have appraised. The thing to be appraised, and with which
the widow parted, was not the value of her real interest in
the land, but the value of her expectancy. It was this that
the heirs had sold, and it was this that was to be estimated.
In *Mulford* v. *Hiers*, 2 *Beasley* 13, the rule was introduced,
that where, after the sale of the premises in partition, the
widow agrees to accept in lieu of her dower such a sum as
the Chancellor shall deem reasonable, and dies before distri-
bution, by such consent the right becomes vested. This
rule is too well established in the practice of the court to be
now shaken. When, consequently, the widow signs such an
agreement, she parts with her annuity for its estimated
value, and the law raises the obligation on the part of the
estate to pay such estimated value. The value of the
widow's annuity at the time of such arrangement is the
thing which in such cases is required to be appraised. The
Chancellor, dissenting from the view of the master, adopted
this rule; but he held upon the facts, that the life of the
widow, at the point of time when her right became thus
vested, was not a good one, and made a large deduction on
that account. I have been unable to satisfy myself that this
conclusion is justified by the evidence. It seems to me that
the testimony conclusively shows that the widow's life was,
at the time in question, an insurable one. The three phy-

sicians who were examined say so; and I can perceive no evidence of an opposite tendency. This widow's life, in my opinion, should have been calculated on the basis that her life was of the value of the average of persons of her age in ordinary health. The decree should be also reformed in this respect.

Let the decree be reversed, but without costs.

CLEMENT, DEPUE, KENNEDY, LATHROP, OGDEN, OLDEN, SCUDDER, VAN SYCKEL, and WOODHULL, JJ., concurred.

Judge BEDLE also concurred, except as to the insurable character of the widow's life. In this respect he voted to affirm the decree of the Chancellor.