51 N.J. Super. 1 (1958)
143 A.2d 208
IN THE MATTER OF THE SALE OF LAND OF SAMUEL W. FLASCH AND JAMES M. FLASCH, MINORS.
IN THE MATTER OF THE ESTATE OF JUNE IRELAND FLASCH, DECEASED. IN THE MATTER OF THE GUARDIANSHIP OF JAMES M. FLASCH AND SAMUEL W. FLASCH, MINORS. SAMUEL W. IRELAND AND BEATRICE F. IRELAND, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
NORMA JEAN FLASCH, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 14, 1958.
Decided June 20, 1958.
*9 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. William Elmer Brown, Jr., argued the cause for plaintiffs-appellants (Messrs. Brown and Frank, attorneys).
Mr. James N. Butler argued the cause for defendant-respondent (Messrs. Moore, Butler & McGee, attorneys).
The opinion of the court was delivered by FREUND, J.A.D.
Four separate actions were consolidated for trial in the Chancery Division of the Superior Court, resulting in a single final judgment which is the subject of this appeal.
June Ireland, daughter of Samuel W. Ireland and Beatrice F. Ireland, married Leo H. Flasch on March 25, 1944. She died on November 22, 1950, intestate, survived by her husband and two children, James Michael, referred to as Jimmy, born May 7, 1945, and Samuel Warren, referred to as Sammy, born December 15, 1946. Prior to and at the time of her death, June and her family lived together in their home at 1 North Somerset Avenue, in Ventnor, *10 New Jersey, title to which was in her name. The house and its furnishings were a gift to June from her parents, the plaintiffs. Leo Flasch was employed by Mr. Ireland. After the death of June, her husband and children continued to live there, and her maternal grandmother, Mrs. Linda R. Fort, joined them and took care of the household. On June 5, 1953 Leo married Norma Jean Johnson, and after a brief honeymoon she moved into the house and Mrs. Fort moved out, although they wished her to remain.
On June 12, 1953, presumably as a result of an understanding during their courtship, a petition for the adoption of the children by Norma Jean, acknowledged on June 10, 1953, was filed in the Atlantic County Court, Probate Division. The plaintiffs in the adoption proceeding were Norma Jean Flasch and Leo H. Flasch, and he attached his written consent, as father of the children. The County Court judge made an order fixing July 30, 1953 as the date for hearing, and directed an investigation by the Department of Institutions and Agencies. Their report was received, the hearing was held, and on July 30, 1953 a judgment was entered for adoption of the children by Norma Jean Flasch.
Leo had been appointed administrator of the estate of June Ireland Flasch on January 1, 1951 and guardian of the estates of his two minor children on April 24, 1953 by the surrogate of Atlantic County.
He made application for the sale of the infants' lands at 1 North Somerset Avenue, Ventnor, and a judgment directing sale was entered on June 26, 1953, pursuant to which he sold the property for $30,000, subject to a mortgage. The sale was duly confirmed and deed was delivered on September 11, 1953. At the same time he also sold the household furniture belonging to his wife's estate for $4,500.
On September 14, 1953 Leo, Norma Jean and their children moved from New Jersey to Whittier, California. There Leo bought a house, using money from a fund substantially constituted by moneys belonging to the children and taking title to it in the names of himself and Norma Jean. On March 24, 1956 Leo died in California, survived by his *11 wife, Norma Jean, the two children of his prior marriage, and a third, Leo Henry Flasch III (Buddy), born to him and Norma on May 19, 1954.
On March 7, 1956, shortly before Leo's death, the Whittier house was sold at a profit and the net proceeds of sale were deposited in joint bank accounts of Leo and Norma Jean.
Soon after Leo's death, Norma Jean and the children returned to New Jersey, where they have since continuously resided. Leo's will, which made Norma Jean sole beneficiary, was probated before the surrogate in Atlantic County, New Jersey, and letters testamentary were duly issued to Norma Jean on May 24, 1956. On the same day she applied for and was appointed substituted guardian of the property of the minor children, Jimmy and Sammy, and substituted administratrix of the estate of June Ireland Flasch, in the place of her husband, Leo. Both applications were based on her claim of right as the adoptive parent of the children by virtue of the judgment of adoption.
On their return from California, Jimmy and Sammy Flasch resided at first with Norma Jean in a hotel apartment in Atlantic City owned by a corporation, the stock of which is owned by her and her mother, but they now reside in Ocean City. From the time of their return to Atlantic City in 1956 and during the summer of 1956 these children visited with their maternal grandparents, the plaintiffs herein, and also with their maternal great-grandmother and other maternal relatives. Unfortunate differences arose between these plaintiffs and Norma Jean which seem cumulatively to have created a very unhappy situation, and consequently the visits between the grandparents and their grandchildren lessened.
Plaintiffs filed a complaint in the Superior Court, Chancery Division, seeking custody of their grandchildren on the ground that the judgment of adoption was invalid, having been obtained in violation of the adoption statute, R.S. 9:3-1 et seq. The court denied their application and dismissed the complaint. This is the first issue dealt with in this opinion.
*12 Leo had made no application for assignment or admeasurement of curtesy in the lands of which his wife June died seized, and he asserted no claim therefor in the sale of infants' land proceedings nor at any time during his life.
On May 22, 1953 Leo applied to the Superior Court for sale of the infants' lands. Pursuant to an order, he sold the property for a net sales price of $15,589.65, and the sale was duly confirmed by the court. On May 24, 1956, two months after his death, five and one-half years after the death of his wife when his curtesy interest became consummate, and almost three years after the sale of the property, an ex parte application was made in the original sale of infants' land proceeding and a judgment was entered on the same day (May 24, 1956), awarding Leo H. Flasch the sum of $4,772.19 out of the proceeds of sale, as the gross sum in lieu of curtesy. The evaluation was made on the basis of Leo's age at the time of his wife's death and upon the net sale price of the property three years later. The judgment was entered on application of the attorney in the original proceeding, and without suggestion upon the record of the curtesy tenant's death.
The plaintiff, Samuel W. Ireland, was appointed guardian ad litem for the minors in order to conserve and protect their interests by reason of their conflict of interests with their guardian Norma Jean, and on his application the aforesaid judgment was opened and set aside in order that the matter might be re-evaluated and re-appraised. At the conclusion of the trial and in the judgment under review, an award for curtesy in the same amount and upon the same basis was made. The propriety of this award is the second issue to be considered.
In the same judgment of the Chancery Division, Superior Court, an allowance was made to Leo in the sum of $7,125.06 for advances made by him for repairs, mortgage interest and installment payments, taxes and insurance, while he was in occupancy of the property with his family. The validity of this allowance is the third question.
*13 As guardian of his minor children, Leo received the moneys belonging to them from the sale of the infants' land, and he retained their distributive share of their mother's personal estate. He did not file any account as guardian or administrator. He had admittedly commingled the funds belonging to the children with his own and used them for his own purposes. He purchased the residential property in Whittier, California, title being taken in his and Norma Jean's names, which resulted in a profit at the sale. The defendant, Norma Jean, as substituted administratrix of the estate of June Ireland Flasch, and as substituted guardian of the children, filed accounts in the respective estates.
After the trial of the consolidated action, the court entered a judgment which, besides dismissing plaintiff's suit for custody of the two minor children, entered a judgment which (a) awarded Norma Jean, as executrix of the estate of Leo, the sum of $4,772.19 for the curtesy interest of Leo as aforesaid; (b) awarded her in the same capacity the sum of $5,428.98 in reimbursement for payments made by Leo for mortgage principal, interest, taxes and insurance in the maintenance of the Ventnor property; and (c) surcharged his estate with the amount of the funds belonging to the children retained by Leo, with interest at 4% per annum, but denied the claim made on their behalf to the profit realized from the investment of these funds in the California property. The fourth question is whether the infants were entitled only to interest or whether they were entitled to the profits resulting from the sale by reason of the use of the cestui's funds.
The last point urged is that the court should appoint a corporate trustee over the infants' estates in the place of Norma Jean.

I.

ADOPTION PROCEEDINGS.
Plaintiffs challenge the validity of the judgment of adoption on the ground that the Atlantic County Court, Probate *14 Division, lacked the jurisdiction or power to enter the judgment, and because it was obtained by fraud and collusion. They seek custody of the minors, as their maternal grand-parents, because it would be to the best interests of the children.
The basis for plaintiffs' attack upon the judgment is that at the time of its entry the minor children had not been living with the petitioner, Norma Jean, for the minimum period of six months as required by the provisions of the adoption statute, R.S. 9:3-5, which provides that:
"A decree of adoption shall not be granted unless the child has been living continuously in the home of the petitioner or petitioners for not less than one year previous to the hearing of the petition; provided, however, that the court, if it finds that the best interests of the child so require, may in its discretion grant a decree of adoption after the child has so lived in the home for a minimum period of six months."
Plaintiffs' charge of fraud and collusion in obtaining the judgment is premised upon the fact that neither in the complaint for adoption nor in the testimony at the hearing did Norma Jean make reference to the fact that the children had been living with her for a period less than the minimum statutory period of six months.
The complaint for adoption was filed jointly by Norma Jean Flasch and Leo H. Flasch, pursuant to R.S. 9:3-1, which provides as follows:
"Any unmarried person of full age, a husband with his wife's consent, a wife with her husband's consent or husband and wife jointly, may petition the orphans' court of the county wherein the petitioner or any minor child may reside for permission to adopt such child and change the name of such child."
The complaint recites that the minors were children of Leo H. and June Ireland Flasch; the date of her death; that they have ever since resided with him; his marriage to Norma Jean on June 5, 1953; that she now resides with them; and Leo's consent, as the natural father of the children, to the adoption by Norma Jean.
*15 The report of the Department of Institutions and Agencies to the court directed attention in three places to the fact that the children had "been in the home of the female plaintiff less than six months and not in the manner approved by Section 9:3-5 of the New Jersey Revised Statutes." Nevertheless, the judge of the County Court entered judgment of adoption.
Adoption was unknown at the common law. Proceedings for adoption are statutory, and exclusive jurisdiction, formerly vested in the Orphans' Court, now reposes in the Superior and County Courts. Adoption Act, R.S. 9:3-1 et seq., as amended by N.J.S.A. 9:3-17 et seq.; Gardner v. Hall, 132 N.J. Eq. 64 (Ch. 1942), affirmed 133 N.J. Eq. 287 (E. & A. 1943); Stawicky v. Stawicky, 12 N.J. Super. 72 (App. Div. 1951); In re H.D., 17 N.J. Super. 230 (App. Div. 1952).
The provision in R.S. 9:3-5 that "A decree of adoption shall not be granted unless the child has been living continuously in the home of the petitioner or petitioners for not less than one year previous to the hearing" or, under appropriate circumstances, "for a minimum period of six months," is a restraint upon the court for the entry of judgment in a proceeding within its jurisdiction.
However, we do not consider it necessary to pass on the question of whether residence is a jurisdictional prerequisite to the entry of the judgment of adoption, cf. Guarantee Bank & Trust Co. v. Gillies, 8 N.J. 88 (1951); In re Reed's Estate, 19 N.J. Super. 387, 394, 395 (Cty. Ct. 1952), in view of our determination of the custody issue.
The Chancery Division judge found it unnecessary to pass upon the validity of the adoption, taking the position that (a) the County Court had jurisdiction of the subject matter of the proceedings, any defect therein not going to jurisdiction, and that consequently the judgment was not subject to collateral attack in the Superior Court action, and (b) in any case the plaintiffs were strangers to the County Court proceedings and without any interest sufficient to attack the judgment.
*16 We have likewise concluded that there is no appropriate occasion now to consider whether the five-year-old adoption judgment is void for failure of compliance with the statute, although the fact of non-compliance is obvious and was without any justification. We reach the result, however, through a different route.
The substantive relief sought by plaintiffs in the Chancery Division proceedings wherein the adoption judgment is impugned was the grant of custody of the children to them. The attack upon the adoption judgment was solely for the purpose of eliminating the adoptive parenthood of Norma Jean as a defense against the petition for custody. It does not appear that plaintiffs would have had any other status or interest in obtaining an adjudication voiding the adoption judgment. (See Shammas v. Shammas, 9 N.J. 321 (1952); In re Goldfarb, 6 N.J. Super. 543 (Ch. 1949); Starr v. Gorman, 136 N.J. Eq. 105 (E. & A. 1945); In re Alsdorf, 142 N.J. Eq. 246 (Ch. 1948)). If, therefore, their case for custody as against Norma Jean were not improved by eliminating her status as adoptive parent of the children, there would be no purpose in passing upon the judgment of adoption. We have concluded that the premise just stated is a valid one.
Even were Norma Jean not the parent of the children by adoption, she nevertheless stood in loco parentis to them ever since her marriage to Leo. She had been in that position for over three years when the complaint herein was filed. In the case of In re Flynn, 87 N.J. Eq. 413 (Ch. 1917), a stepmother who stood in loco parentis to minor children was held to have a prior right of custody as against aunts and uncles who, for that purpose, were described in the case as strangers. This rule would, of course, be subject to qualification were it shown that the person in loco parentis was unfit or if any other consideration clearly dictated that the best interests and welfare of the children required a transfer of custody. In the present case, however, even the plaintiffs concede that the defendant is a fit person to exercise *17 custody, and, for reasons which we shall state more fully hereinafter, we have concluded that the welfare of the children is compatible with their remaining in defendant's custody. There is consequently no appropriate occasion for embarking into the disputed question as to whether the errors which attended the adoption proceedings are such as to render the judgment therein void.
It may, moreover, be pointed out, but not by way of condoning the failure to follow the statutory requirement in the adoption proceeding, that the policy objective of the pre-adoption residence requirement in the statute has by now been more than met in the continuous parent-children relationship which the defendant and these boys have sustained over the years. It would hardly be seemly for a court of equity to go out of its way to entertain an attack on a judgment of adoption brought by grandparents three years after they first knew the facts which they subsequently set forth as a legal basis for nullifying the adoption judgment, doing nothing in the meantime, while close ties of love and filial relationship were growing between the children and the adoptive mother. Although strangers to the proceedings, plaintiffs were by no means strangers to the children. They had the same interest then as they have today, and could, if in no more than the role of amici curiae, have called the County Court's attention to the fact that the judgment was not properly entered.
It is only fair to remark, incidentally, that the charge of fraud and collusion, based on concealment or failure to disclose that the children had not resided with Norma Jean for six months prior to the entry of the judgment, is without merit. The complaint and the report disclosed the fact that the children from birth had resided with their natural parents; that they continued to live with their father after their mother's death until his remarriage when Norma Jean became a member of their household; and that Norma Jean's marriage and residence with the children originated less than two months prior to the date of the judgment.

*18 II.

CUSTODY PROCEEDINGS.
Plaintiffs' action for custody was brought under R.S. 9:2-9, which provides that any person interested in the welfare of the child may petition the court for a change of custody because of the unfitness of the parent or person presently having custody of the child. Without regard to the judgment of adoption or to the fact that she is the substituted guardian of the children, defendant stands in loco parentis to James and Samuel Flasch. In re Flynn, supra. As such, she has a right of custody as against plaintiffs, who have no such statutory right for that is reserved only to parents or guardians. Plaintiffs' burden under such circumstances was to show the moral unfitness of Norma Jean. Such unfitness has not been demonstrated in this case.
The trial court properly, in the exercise of its parens patriae jurisdiction, considered the welfare of the children. We find no justifiable ground for disturbing its award of custody.
The trial judge had the advantage of the personal appearance of the parties and of discussions with the children; additionally, he had the wisdom which comes from an accretion of experience in dealing with such matters. Particularly in a case of this nature, is it true that general principles of law do not decide concrete cases, as has been so aptly said. Each matter must be decided on its own merits with the best interests and welfare of the children as the paramount consideration. To this principle, even parental rights must yield. Lavigne v. Family & Children's Soc. of Elizabeth, 11 N.J. 473 (1953); Richards v. Collins, 45 N.J. Eq. 283 (E. & A. 1889); Starr v. Gorman, supra; In re Goldfarb, supra.
At the time of her marriage in June 1953 the defendant was 25 years of age, and the children 8 and 6, respectively. They have since lived together as a family unit. Apart from the adoption judgment, but by virtue of her *19 marriage to their natural father and their living together in a common household as members of a family for the past five years, defendant has lived the role of mother to these children as fully as though she were their natural mother.
What renders this phase of the case particularly difficult of adjudication is not its legal aspects, but the human and psychological elements involved. For here, both the plaintiffs, who are related to the children by blood, and the defendant, who stands in loco parentis, are persons of good character, each of them lovingly disposed toward the children.
The plaintiffs are now respectively 57 and 55 years of age. They are people of substantial means, of good moral character, and reputable standing in their community. Concededly, the children would have a good home with them. The financial status of the plaintiffs is better than that of the defendant. On the other hand, the record establishes that the defendant, like the natural mother of the children, is also a person of good character, education and culture. She has maintained a home for the children in which they have been well and lovingly cared for. There is not the slightest indication or intimation in the record that she is anything other than a fit person.
From our independent consideration of the voluminous record, we agree with the trial court's conclusion that the welfare of the children would best be served by not disturbing their custody with the defendant.

III.

CURTESY.
The property at 1 North Somerset Avenue, Ventnor, New Jersey, was a single-family dwelling house, and the home of June Ireland Flasch, her husband and children. As already noted, it was a gift from her parents, the plaintiffs, and title was in her name. Upon her death intestate on November 22, 1950, the title descended to her two minor children, subject to the curtesy of her husband. Leo and his children continued to live in the house for almost three years, until after the *20 sale of the property on September 11, 1953. On April 24, 1953 he was appointed guardian of the property of his children.
As noted above, the Chancery Division confirmed the previous determination that there should be awarded to the estate of Leo Flasch the sum of $4,772.19 as representing the value of his curtesy interest in the property of June Flasch which had been sold. The plaintiff guardian ad litem for the minors attacks this allowance on the ground that the curtesy right abated on the death of Leo without application for assignment thereof.
A surviving spouse has two interests in the realty of which the deceased spouse dies seized: the right of quarantine, N.J.S. 3A:35-4  the temporary right to remain in and use the mansion house  and a life estate in one-half of all of the realty. N.J.S. 3A:35-1, 2. The former will be discussed hereinafter under Point IV of this opinion.
An inchoate right of curtesy arises out of the marriage relation and upon the death of the wife it becomes consummate in the husband. Reese v. Stires, 87 N.J. Eq. 32 (Ch. 1917). The extent of a husband's curtesy in his wife's property is governed by the law in effect when she becomes seized thereof. Kicey v. Kicey, 112 N.J. Eq. 459 (Ch. 1933), affirmed 114 N.J. Eq. 116 (E. & A. 1933). N.J.S. 3A:35-2 provides:
"The widower * * * shall be endowed, for the term of his natural life, of the 1 full and equal half part of all real estate whereof his wife, * * * was seized of an estate of inheritance at any time during coverture, * * *. The right of curtesy shall be enforced, admeasured and determined in the same manner and subject to the same limitations and restrictions as is provided by law in case of dower."
Plaintiffs urge that curtesy consummate is a life interest extinguished by the death of the life tenant and, if unassigned before death, that cause of action is abated. Phair v. Monticello Realty Co., Inc., 131 N.J. Eq. 519, 521 (E. & A. 1942); Pollitt v. Kerr, 49 N.J. Eq. 65, 67 (Ch. 1891); Needles v. Dougherty, 134 N.J. Eq. 108, 114 (Ch. *21 1943); Grobart v. North Jersey, etc., Commission, 142 N.J. Eq. 60 (Ch. 1948). These cases involved dower and the courts held that until dower is assigned, the right of a widow in the land of her husband is a mere chose in action which abates with her death. But see McLaughlin v. McLaughlin, 22 N.J. Eq. 505 (E. & A. 1871), holding that the death of the widow cannot affect her interest where she has previously consented to take a gross sum in lieu of dower upon sale. This characteristic of dower was at common law different from curtesy initiate or curtesy consummate, which was held to be an estate arising by operation of law, leviable and salable under an execution, while dower before assignment was not. Hopper v. Gurtman, 126 N.J.L. 263, 273, 133 A.L.R. 621 (E. & A. 1941); Anastasia v. Anastasia, 138 N.J. Eq. 260 (Ch. 1946). Under the statute now existing there is no basis for difference in treatment between unassigned dower and unassigned curtesy. The statute requires both kinds of rights to be "enforced, admeasured and determined in the same manner." N.J.S. 3A:35-2. On principle, therefore, it appears to us that the rule barring dower upon the death of the widow prior to assignment of dower is controlling as to rights both of curtesy and dower accruing since the adoption of the statute now found in N.J.S. 3A:35-2, which occurred in 1927. (L. 1927, c. 71).
No different result is called for because of the circumstance that there was a sale of the infants' land free of the curtesy interest. Leo could have asked at that time that his curtesy interest be transmuted into an interest in the proceeds of sale, either by way of allowance of a gross sum or by investment of a proper share for life. N.J.S. 3A:38-7; Dickinson, Chancery Practice and Precedents (rev. ed. 1894), p. 447 and note. He did neither. There is no power in a court to order a payment of a gross sum in lieu of curtesy without the authorization of a statute. Potter v. Watkins, 104 N.J. Eq. 13, 17 (Ch. 1928). We are of the opinion, therefore, that after Leo's death, the court could not retrospectively award him a gross sum which he had never asked for or consented to take. At best, his theoretical interest *22 might be regarded as a life estate in a substituted share of the proceeds of sale. Any such interest, however, would have abated with his death.
Plaintiffs further urge that because the husband occupied the property for almost three years after his wife's death on November 22, 1950, until the sale in September 1953, and thereafter enjoyed the benefits of the full proceeds of the sale until his death on March 24, 1956, those claiming under him are estopped from asserting his claim of curtesy.
Curtesy may be waived or barred on the theory of estoppel, if the husband's act or conduct is inconsistent with his claim. 1 American Law of Property, § 5.66, p. 796; 25 C.J.S. Curtesy § 12, j, Estoppel or Waiver, p. 58. Here, as already mentioned, the husband at no time during his life asserted or made any claim of curtesy nor did he initiate any proceedings for the evaluation of his interest. He did absolutely nothing from which even an inference can be drawn that he intended to assert such a claim. On the contrary, his actions and conduct furnish evidence that he did not intend to make any such claim. He continued to live in the house with his minor children for almost three years after the death of his wife before he made application for the sale of infants' lands. He might have applied for admeasurement of curtesy under N.J.S. 3A:36-2, in an independent proceeding; or, as indicated above, he could have had his interest evaluated and either a sum in gross directed to be paid to him or an investment created for his lifetime, out of the proceeds of the sale in the sale of infants' land proceeding. But he did neither. On September 11, 1953 he executed and delivered the deed as guardian and individually to the purchaser, and he received the proceeds of sale and used them as his own, as will be hereinafter discussed. During the remainder of his life, he took no step whatsoever toward the assertion of a curtesy claim in the proceeds of sale. These facts indicate that he had no intention to claim curtesy; and, when considered in conjunction with the fact that his children were so young, cogency is added to the conclusion that he never contemplated or intended to assert the *23 claim, but rather that he waived it in their favor. His executrix is estopped from asserting a claim which the decedent had so manifestly waived in favor of his children. The allowance of a sum in gross for curtesy was erroneous.
The allowance to Leo's estate of a sum in lieu of curtesy will therefore be set aside.

IV.

ALLOWANCE FOR CARRYING CHARGES ON PROPERTY.
The judgment under appeal allowed defendant, as executrix of the estate of Leo H. Flasch, the total sum of $5,428.98, to be deducted from the proceeds of sale, as reimbursement for payments of mortgage principal, interest, taxes and insurance premiums paid by Leo H. Flasch during his occupancy of the property from the date of his wife's death to the date of sale. The theory upon which the allowance was made was that he was in possession of the dwelling house under right of quarantine and not as curtesy tenant, therefore being free from obligation to pay maintenance expenses on the realty and being entitled to reimbursement for any such payment made. Bruten v. Miller, 28 N.J. Super. 531 (Ch. Div. 1953), is cited in support of the claim. As we shall show, the facts in the present case clearly distinguish this situation from that controlled by the general rule.
At common law and in New Jersey prior to 1929, the right of quarantine was enjoyed only by the widow and was usually limited to 40 days. Its purpose was not only to provide the widow with a dwelling place, but also to compel the heirs to make an assignment of dower. McLaughlin v. McLaughlin, supra; Asmus v. Asmus, 122 N.J. Eq. 485 (Ch. 1937), affirmed 125 N.J. Eq. 362, 363 (E. & A. 1939); Woolf v. Woolf, 10 N.J. Super. 470 (App. Div. 1950); 7 N.J. Practice (Clapp, Wills and Administration) (1950), § 835, p. 324; § 855, p. 361 (1950); 1 American Law of Property, § 5.44, p. 741. Today, by statute, both husband and wife are entitled to quarantine. N.J.S. 3A:35-4 provides:
*24 "Until dower or curtesy is assigned, the widow or widower may remain in, hold and enjoy the mansion house of his or her spouse and the messuage and plantation belonging thereto, without being liable to pay rent therefor.
After assignment of dower or curtesy, the rights confirmed in and granted to the widow or widower by this section shall cease."
The widow or widower has the right to occupy the homestead or rent it to others until dower or curtesy is assigned. Alt v. Kwiatek, 128 N.J. Eq. 469 (Ch. 1941); Woolf v. Woolf, supra. In Woolf the term of quarantine continued for three years, the court observing that "The continuation of the widow's right of quarantine is the penalty the statute imposes on the heirs who do not assign her dower." (Woolf v. Woolf, 10 N.J. Super. at page 474).
The extension of the right of quarantine to the widower is for the same general purpose as it is in the case of a widow. 17A Am. Jur., Dower, § 149 et seq., p. 416 (1957). In the instant case, the heirs were infants and their father, being their natural and legal guardian, was the only person who could on their behalf move to compel an assignment of curtesy. The interests of the widower and the heirs, insofar as the continuance of occupancy of the premises rentfree by the widower was concerned, were conflicting. A widower, who is a parent and a fiduciary of the heirs of the deceased spouse, is under a duty to have his curtesy interest allotted at once or have someone else appointed as guardian ad litem for the minors so that he may have his curtesy interest promptly assigned or evaluated. It was a breach of Leo's fiduciary obligation to defer application for assignment of curtesy with the result of a claim on behalf of his estate to accrue the right of a surviving spouse in quarantine to occupy the realty free of the obligation of payment of taxes, interest on mortgage, or maintenance repairs, as permitted by the cases. Spinning v. Spinning, 41 N.J. Eq. 427 (Ch. 1886), affirmed 43 N.J. Eq. 215 (E. & A. 1887); Bahr v. Cooper, 141 N.J. Eq. 584, 587 (Ch. 1948). Had he discharged his fiduciary obligation to the children and had curtesy assigned to him, he would have become a *25 life tenant, charged, pro tanto, with the payment of taxes, interest on mortgage, and repairs. In re Steele, 19 N.J. Eq. 120 (Ch. 1868); Dinges v. Dinges, 1 N.J. Super. 390 (Ch. Div. 1948).
Among the payments for which the estate of Leo was given credit in the Chancery Division were payments on account of the principal of the mortgage indebtedness on the Ventnor property. The plaintiff guardian ad litem challenges this allowance as improper. Whether a life tenant who pays off an encumbrance is entitled to reimbursement or contribution from the remainderman depends primarily upon the intention of the life tenant. Coughlin v. Kennedy, 132 N.J. Eq. 383, 386 (Ch. 1942); Annotation, 87 A.L.R. 220 (1933); 33 Am. Jur., Life Estates, Remainders, etc., § 461, p. 996. Here, there are over-riding considerations why the estate of Leo was not entitled to any reimbursement for payments of mortgage principal made by him if he is regarded as a life tenant. These payments were presumably voluntary contributions in the nature of gifts to his minor children. Farlee v. Field, 36 A. 945 (Ch. 1897, Reed, V.C.); Kinkead v. Ryan, 65 N.J. Eq. 726 (E. & A. 1903); Bankers Trust Co. v. Bank of Rockville, etc., 114 N.J. Eq. 391, 399 (E. & A. 1933).
It is clear that the same general considerations apply to the other maintenance expenses incurred by Leo during his lifetime in connection with the Ventnor home. They will be regarded as expenditures made by a father pursuant to his obligation to maintain the household and support his children. Royce v. Royce, 124 N.J. Eq. 469 (E. & A. 1938); Marsh v. Scott, 2 N.J. Super. 240 (Ch. Div. 1949).
These claims for reimbursement were not made by Leo in his lifetime. Without repeating the facts, we need only remark that it is our judgment that all payments in connection with the property were made by the father in recognition of his obligation to support his minor children or as gifts to them, and that he had no intention of claiming reimbursement. We have no doubt that he desired to, and did, voluntarily maintain his household at his own expense *26 just as he did during his first wife's lifetime. We are fortified in this position by the fact that decedent made no claim whatsoever for reimbursement during his lifetime, but the claim was made for the first time by his estate, almost three years after the property was sold.
In Farlee v. Field, supra, the facts were that a grandmother, an executrix of her husband's estate, voluntarily used her own money to pay off a mortgage on her husband's property and also to pay debts of her husband's estate in the shape of insurance, interest on mortgage, taxes, etc. After her death, intestate, her daughter (mother of the children), administratrix of her estate, filed a bill against the executor of her father's estate for repayment of money paid by her mother for mortgage and debts. Vice-Chancellor Reed considered these payments as a gift from the grandmother to her grandchildren.
"She used her money during her life to carry out her idea of preserving the estate in the best way for furnishing a support for herself and her grandchildren. It is quite unlikely that she ever contemplated a breaking up of the homestead during the minority of the infants; * * *. In my judgment, Lucinda never had any intention of asserting such a claim. The expenditures were gifts of her own money, for the benefit of the trust estate. * * * So now all the circumstances surrounding the payment of these sums persuade me that the payments were intended for the eventual benefit of the infants, by enabling them to have the benefit of the trust estate, free from all encumbrances." Farlee v. Field, 36 A. 945, 946 (Ch. 1897).
In Kinkead v. Ryan, supra, a widow was a life tenant and a tenant in common. The lands were subject to a mortgage which the widow, with her own money, paid off causing the mortgage to be satisfied, and from the time of payment until the time of her death, she never asserted any right against her co-tenants or their estate because of that payment. The Court of Errors and Appeals reversed the conclusion of the vice-chancellor who held that the widow was entitled to stand in the place of the mortgagee for the purpose of securing contribution by her co-tenant, on the ground that she never *27 had any intention of acquiring the right. Mr. Justice Dixon said:
"* * * whether she would acquire such right depended upon her intention at the time of making the payment. A court of equity will keep an encumbrance alive or consider it extinguished, as will best serve the purposes of justice and the actual and just intention of the party. * * * she furnished substantial evidence of a design that the burdens which they created should be wholly extinguished. Although this evidence might not be deemed conclusive, incapable of rebuttal, yet, when we find that the burdens thus to be removed could rest only upon her daughter and infant grandson, and that during a period of more than seven years thereafter she gave no sign of a thought that the burdens remained, we are impelled to the belief that she intended their extinguishment. * * * We think that when Mrs. Mathews paid off the bond and mortgage she intended a benefaction to her daughter and grandson, and not to be subrogated to any claims against them or their estate." Kinkead v. Ryan, 65 N.J. Eq. 726 (E. & A. 1903). (Italics by the court.)
The allowance of reimbursement for mortgage principal and interest payments and other maintenance charges will be set aside.

V.

PROFIT FROM SALE OF CALIFORNIA PROPERTY.
Leo Flasch, as administrator of his wife's estate, sold the household furniture for $4,500 at the same time that he sold the realty, and received the net sum of $20,089.65 in the form of three checks. Two checks were drawn to his order as guardian for James M. Flasch and Samuel W. Flasch for $14,589.65 and $1,000; and a third to his personal order for $4,500. He personally cashed these three checks and the same day deposited $10,000 in cash in a savings account in an Atlantic City bank in his own name, and $10,089.65 in a joint bank account in the same bank in the names of himself and defendant, Norma J. Flasch. It is admitted that he treated all moneys coming into his possession as administrator of the estate and as guardian of his children as his own. He commingled them with his own *28 funds and neither segregated nor accounted for the minors' property.
Shortly after removal to Whittier, California, a house was purchased and title taken in the names of Leo H. Flasch and Norma Jean, and this was used as the home of the family. It was acquired at a net cost of $7,286 and sold for the net sum of $11,603.23, resulting in a profit of $4,317.23. Except for the deposit of $500 paid on the purchase price with the children's money, the balance of $6,786 was drawn from a Whittier bank account, in the joint names of Leo and Norma, which consisted of the funds belonging to the children from the sale of the Ventnor property and a deposit of $4,042.58 of her own money made into the same account by Norma. At the time of the purchase (November 3, 1953), the total deposits in the Whittier bank amounted to $19,379.35, of which $15,336.77 was the children's money and $4,042.58 was Norma's money. The trial judge found that Leo had wrongfully used the children's funds in the investment, and said:
"* * * Although I am satisfied that she had no actual knowledge of the illegal commingling and use of funds by her husband, I cannot overlook the fact that from the testimony she should have made some inquiry as to the source of the funds expended by her husband. She was 25 years of age at the time of her marriage, and a college graduate. Making due allowance for her love and confidence in her groom, but keeping in mind her husband's earning capacity, her knowledge of the sale of the realty in New Jersey, and her knowledge that her adopted children had an interest in the estate of their late mother and the Somerset Avenue realty, she should have been put upon some inquiry as to the source of the $18,000. or $19,000. expended in a five month period. She should have made some inquiry as to why, after the sale of the New Jersey realty, the money was deposited in the Guarantee Bank & Trust Co. of Atlantic City in two separate accounts, i.e., (1) a joint checking account in the sum of $10,089.65, and (2) a savings account in her husband's sole name in the sum of $10,000. Through her failure to inquire, it was possible for her husband, the guardian, to illegally use the wards' funds for the mutual benefit of defendant and her husband. She cannot blindly acquiesce in the deposit and use of monies under the present circumstances. As a result, the infants have sustained a serious loss. Not only has defendant failed to trace her funds into the California realty, but by her inaction we find ourselves in this untenable position." *29 On the settlement of the judgment, the judge ordered reimbursement to the infants of their money, together with interest at 4% per annum, declining to surcharge the profit from the investment of their funds on the ground that some part of the purchase price may have come from the moneys in the account belonging to Norma, and for the further reason that the children had the benefit of living in the house.
The law is settled that where a fiduciary commingles trust funds with his own, equity imposes a trust upon the entire fund, and if property is purchased in his own name with trust moneys, a trust will result in the property purchased, and the burden is upon the trustee to show the amount of his own funds which may have entered into the purchase. Stretch v. Watson, 5 N.J. 268, 279 (1950); Bohle v. Hasselbroch, 64 N.J. Eq. 334, 336 (E. & A. 1902). When the use of such trust funds results in a profit, the cestui que trust has the choice of taking the profit realized by the trustee therefrom, or compound interest on the sum so invested, irrespective of the good or bad faith of the trustee. Liberty Title & Trust Co. v. Plews, 6 N.J. 28 (1950); McKnight's Executors v. Walsh, 24 N.J. Eq. 498, 509 (E. & A. 1873); Windmuller v. Spirits Distributing Co., 83 N.J. Eq. 6, 14 (Ch. 1914); Pennsylvania Company, etc., v. Gillmore, 142 N.J. Eq. 27, 49 (Ch. 1948). The argument that the cestuis, in this case minor children, resided in the premises is hardly any valid reason for suspension of the rule. Both Leo and the defendant, as parents, owed the children a duty of supporting them at the parents' expense. Indeed, if a parent uses funds of his minor children contrary to law, his responsibility for restitution, with profit or interest, should not be any less than it would be if he were acting as trustee for others.
We agree with the trial judge that the defendant should not be penalized for the improper use of the fund, although she would seem to have had sufficient knowledge to put her on inquiry as to whether the moneys belonging to the minors was not being used in the purchase of the property. But we do not conceive that giving the infants *30 the profit on an investment attributable to their funds is the imposition of a penalty upon the defendant. From the evidence, the sum invested in the Whittier property amounted to $7,286 taken from a bank account aggregating $19,379.35, of which $4,042.58 was defendant's and the remainder belonged to the boys.
Under these circumstances, the presumption should be indulged that the $7,286 used to purchase the Whittier property came from the money of the children in the Whittier account, rather than from Norma's money. As held by the Chancery Division judge, the defendant had sufficient knowledge to have put her on inquiry as to whether the money belonging to the boys was not being used in the process of the entire project of transferring the new home established by Leo and Norma from Atlantic City to California. We will, therefore, apply the rule that as between such innocent wards as the children, on the one hand, and an adult on notice of their rights, on the other, all presumptions should be in favor of the children, including the presumption that all of the money used to acquire the Whittier property was theirs and that they are therefore entitled to the profit on the resale of the Whittier property. Liberty Title & Trust Co. v. Plews, supra; McKnight's Executors v. Walsh, 23 N.J. Eq. 136, 146 (Ch. 1872); Windmuller v. Spirits Distributing Co., supra (83 N.J. Eq. at pages 15, 16); Christian v. Canfield, 108 N.J. Eq. 547, 552 (Ch. 1931); Pennsylvania Company, etc., v. Gillmore, supra (142 N.J. Eq. at page 49).
The judgment under review will be modified to effectuate this determination.

VI.

APPOINTMENT OF INDEPENDENT TRUSTEE.
Plaintiffs urge the appointment of an independent and disinterested trustee, preferably a corporate trustee, for the better protection and preservation of the infants' interests. Defendant does not argue against such an appointment. Without reflecting on the character or integrity of the defendant, *31 but in the interest of protecting and preserving the property of the infants and to relieve her of the burden and responsibility of management, we agree that a corporate trustee should be appointed.

CONCLUSION.
The judgment dismissing plaintiffs' complaint for custody is affirmed, the charges allowed herein in favor of the infants shall extend to all assets and property belonging to Leo H. Flasch which may have come into defendant's possession, and in the other respects herein discussed the judgment is modified to the extent stated in this opinion. The cause is remanded for the appointment of a trustee and for such further proceedings as will carry out the determination herein, without costs to either party.