74 N.J. Super. 178 (1962)
181 A.2d 14
IN THE MATTER OF APPLICATION OF MRS. M FOR WRIT OF HABEAS CORPUS.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 1962.
Decided May 7, 1962.
*179 Before Judges PRICE, GOLDMANN and LEWIS.
Mr. Erhard B. Thierfelder argued the cause for appellant Mrs. M (Messrs. Hillas and Thierfelder, attorneys).
Mr. Edward F. Broderick, Jr., argued the cause for respondent Mrs. R (Mr. Edward F. Broderick, attorney).
*180 The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Mrs. M filed a complaint in the Chancery Division alleging that she is the mother of G, a 19-month-old girl; that the child was in the custody of Mrs. R who claimed her by reason of an agreement with plaintiff, and that Mrs. R refused to return G despite a demand that she do so. Plaintiff contended that Mrs. R's detention of the girl was illegal, and requested that a writ of habeas corpus issue. The writ issued and, after a full hearing, was discharged. The trial court gave custody of the infant to Mrs. R. We granted Mrs. M leave to appeal as an indigent.

I.
Plaintiff is a woman in poor circumstances, 30 years old and the mother of four children. She married Mr. M in 1950 and had two daughters by him, respectively aged ten and eight at the time of the trial. The couple separated in 1955, Mrs. M retaining custody of the girls. She went to live with her godmother and worked in a coat factory for a year or two to support the two children. She then moved to her mother's home and worked as a housekeeper at the local hospital. In 1958 plaintiff had a son, born out of wedlock. She instituted support proceedings against the putative father, but he denied paternity and the case was discontinued. He has never supported the boy.
G was born out of wedlock on January 6, 1960. The father acknowledges paternity. At first he helped support the child, but then stopped. Plaintiff continued to work full-time at the hospital until just before G was born. After G's birth the mother worked at two jobs  part-time at the hospital and full-time at the county welfare house. She tried to keep the family together, but could find no one who would rent to her because of the four children. As a result, she had to place them with a woman of her acquaintance, paying $54 a week for their care and support while she continued working.
*181 Mr. and Mrs. R, both now over 50 years old, married in October 1954. This was Mrs. R's second marriage, the first (in 1934) having been terminated by the death of her husband. As a very young girl she had borne two children out of wedlock, in 1924 and 1925. Mr. R came to this country in 1955 from the British West Indies, where he had fathered two children out of wedlock, one born in 1951 and the other in 1953.
Mrs. R worked at the same hospital as Mrs. M, and on learning that plaintiff was pregnant asked if she might have the baby if it was a girl. Plaintiff said she would have to think about it. After the baby was born and plaintiff had returned to work, Mrs. R again spoke to her about the baby. Plaintiff requested a little more time to consider the matter. At that time she had no place where she and her children could live together. Finally, when Mrs. R once more asked for the baby, plaintiff turned G over to her on June 19, 1960. However, she refused to sign any adoption papers, nor did she give Mrs. R the birth certificate. Plaintiff testified that the understanding was that she could see G and that the child should "know who her mother was and that she had sisters and a brother." She admitted she did not go to see G very often "because it hurt me to go see her and I didn't want to hurt Mrs. [R] and myself."
Mrs. R testified that she met plaintiff while working at the hospital and took a liking to her. Plaintiff told her of her pregnancy and that sometimes she did not have anything to eat. Plaintiff did not ask for help, but had said she did not want the baby when it was born. According to Mrs. R, when she asked plaintiff for the child, Mrs. M replied:
"* * * `Well, I don't want to give no papers on it.' I said, `Well, what are you going to do?' She said, `You take the baby. You can have the baby and keep it as long as you live, and if anything should happen to you, I want my child back.' I told her that it was no more than right that she would get it back because she was the mother."
*182 Plaintiff fell ill in October 1960, and it was only then that she went to the welfare board for assistance. She has been on relief since. She receives $10 a week from Mr. M for each of their two daughters and $175 a month from the State. It would appear that the father of G will contribute something towards her support when and if the child is returned to the mother.
In April 1961 plaintiff moved to a five-room apartment and took the three older children back from the woman who had been boarding them. She then went to the county legal aid society to see what could be done about getting G back. Present counsel was assigned her, and on July 31, 1961 she and the attorney asked Mrs. R to return the child. Plaintiff testified that she refused to do so unless and until she was repaid what she had spent on the baby. These proceedings followed.
Mr. R's children live in the British West Indies, and Mrs. R's in Maryland. As Mrs. R expressed it, she had "not a chicken or child" when she received the baby girl from Mrs. M. Mr. and Mrs. R live in an apartment containing two bedrooms, a kitchen, dining room and bath. Another woman and her two children occupy one of the two bedrooms, and the Rs and baby G share the other. Mr. and Mrs. R testified they are church members and take G to church with them. Plaintiff goes to church "once in a while," and sends her older children, who sing in the church choir.
At the close of the hearing on the return of the writ the trial judge delivered an oral opinion in which he specifically found that plaintiff had never abandoned G, either under the statute, R.S. 9:6-1, or under the common law. He also specifically found, and emphasized, that neither plaintiff nor Mr. and Mrs. R were morally unfit to have custody of G: "I would be willing to entrust this child with either of the parties." As he viewed the case, the fact that there were illegitimate children in the past history of Mrs. M and the Rs had no real bearing on the *183 issue before the court. Nor, in his opinion, was the question an economic one; it did not matter who had the more money to raise the child. As always, the only question was: What is for the best interests of the child? The trial judge particularly mentioned that he had observed the parties in court. The little girl had been sitting on the laps of Mr. and Mrs. R, and seemed "entirely secure and happy."
As we read the trial judge's remarks, two considerations seem to have led him to conclude that G be awarded to Mr. and Mrs. R. The first was that in their care the girl would have a father. The second reason was the possible effect of "taking the roots of [G] from where she is now and ripping them apart and planting her some other place." The trial judge obviously found his decision almost as difficult as Solomon's, for at the end of his remarks he turned to the mother and said, "That is very hard for me to say because after looking at the two girls you have here in court, I wouldn't hesitate to award children to you. I wouldn't hesitate one bit."

II.
It is a principle of long standing that in dealing with the custody and upbringing of an infant the welfare of the child is the controlling consideration. Richards v. Collins, 45 N.J. Eq. 283, 287 (E. & A. 1889); Fantony v. Fantony, 21 N.J. 525, 536 (1956); Lavigne v. Family and Children's Society of Elizabeth, 11 N.J. 473, 479 (1953). Even parental rights must yield to this principle. In re A.B.M., 132 N.J. Eq. 434, 441 (E. & A. 1942); Richards v. Collins, above; In re Pfahler, 102 N.J. Eq. 161, 167 (Ch. 1928).
Although the safety, happiness, and physical, mental and moral welfare of the child is the prime determinant in custodial arrangements, common law courts have been sensitive to the "right" of a parent to the custody of his or her child. This right, which recognizes the natural bond of *184 blood and affection between parent and child, is unlike a property right. It has been described as akin to a trust reposed in the parent by the State, as parens patriae, for the welfare of the infant. Lippincott v. Lippincott, 97 N.J. Eq. 517, 519 (E. & A. 1925). The right (or trust) is also extended to the mother of an illegitimate child, and has been confirmed by our statute, N.J.S.A. 9:16-1, which states that it is "intended to be declaratory of the existing law upon this subject." The right, however, is subject to a number of qualifications.
If, for example, the parent is unfit, the best interests of the infant would, of course, dictate that the child should not be turned over to the parent by the person who has had custody and provided a good home. See In re Alsdorf, 142 N.J. Eq. 246 (Ch. 1948), where a father was denied custody as against the children's maternal grandfather in a situation where the father was in debt, had previously lost custody by reason of his failure to care for the children, been divorced by a prior wife for adultery, been convicted for forgery and larceny, avoided an embezzlement charge by borrowing money from respondent grandfather to pay back the money he had taken, and had not demonstrated financial ability to provide for the children and his third wife, with whom he was living at the time of the trial. See also In re R.L., 137 N.J. Eq. 271 (Ch. 1945), where the mother was denied custody of her infant daughter, as against her sister and brother-in-law, after it was shown that she was prone to meritricious relationships with men, had been committed to reformatories, had not had time to care for the child properly, and had in fact entered into an arrangement to have her sister and brother-in-law adopt the child, the adoption proceedings being interrupted by her subsequent protest; and In re Pfahler, above, where the five-year-old daughter was awarded to the maternal grandmother rather than its father, the proofs showing that he had exhibited little interest in the child, and his second wife was known to mistreat children entrusted to her care, *185 drink heavily and otherwise conduct herself in a manner which reflected upon her behavior and morals.
Again, the right to custody is lost where there has been abandonment by the parent. See, for example, Lavigne v. Family and Children's Society of Elizabeth, above, where the natural parents had formally consented to adoption of the child and had surrendered it to an adoption agency for such purpose; In re A.B.M., above, reversing In re Malley, 131 N.J. Eq. 404 (Ch. 1942), where it was found, on the facts of that case, that abandonment could not be rescinded after the mother had evinced a total disregard for the child both before and for some time after its birth; and Wood v. Wood, 77 N.J. Eq. 593 (E. & A. 1910), where the court, in reinstating the decree of the orphan's court, agreed with the trial judge that although there was "no actual abandonment, i.e., desertion, of the child by its mother, there has been such conduct on the part of the mother as amounts to an abandonment within the meaning of that word as used in the statute." The statute referred to was L. 1905, c. 149, amending L. 1902, c. 92, § 1.
The word "abandoned" in the 1905 statute was replaced by the phrase "forsaken parental obligations" in R.S. 9:3-4, repealed by L. 1953, c. 264, § 18. "Abandonment" is now defined by R.S. 9:6-1:
"Abandonment of a child shall consist in any of the following acts by any one having the custody or control of the child: (a) willfully forsaking a child; (b) failing to care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection; (c) failing to care for and keep the control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public, or by child caring societies or private persons not legally chargeable with its or their care, custody and control."
Although this statute defines "abandonment" in the criminal sense, see N.J.S.A. 9:6-3, it has been used to establish the abandonment necessary to authorize a court to deny a *186 parent's right to custody. See Lavigne v. Family and Children's Society of Elizabeth, above, 11 N.J., at pages 480-481, and In re A.B.M., above, 132 N.J. Eq., at page 441. Both courts quoted from Winans v. Luppie, 47 N.J. Eq. 302, 304-305 (E. & A. 1890), decided before the enactment of the predecessor to R.S. 9:6-1:
"The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion to decide whether another may assume these claims and duties, than does the signature of the parent, which a mere impulse may induce. It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust, that, solely because of the parent's caprice, legal sanction should be refused to the new conditions. Under such circumstances, a court might lawfully deem the abandonment irrevocable, so far as the claims of the parent were concerned."
Courts have traditionally been reluctant to deny a parent custody of his or her child. See, for example, Titus v. McGloskey, 67 N.J. Eq. 709 (E. & A. 1904); Pope v. Brown, 3 N.J. Misc. 572, 128 A. 851 (Ch. 1925); Hesselman v. Haas, 71 N.J. Eq. 689 (Ch. 1906); Ziezel v. Hutchinson, 91 N.J. Eq. 325 (E. & A. 1920); In re Judge, 91 N.J. Eq. 395 (Ch. 1920); Starr v. Gorman, 136 N.J. Eq. 105 (E. & A. 1945); and Baum v. Kornberg, 139 N.J. Eq. 265 (E. & A. 1947). In all of these cases, however, the court was careful to detail the facts showing that there was no abandonment, or that the situation indicated that the best interests of the child would be served *187 by returning it to the parent. The diverse factual patterns revealed in those decisions lend strong support for our conclusion that the best interests of G require that she be given back to her mother, Mrs. M.

III.
We have earlier noted that the trial judge expressly found that plaintiff was not unfit to have her infant daughter's custody. Indeed, he found the parties equally fit to raise G. Our review of the record convinces us that there was insufficient evidence to support a finding of the mother's unfitness under the cases just cited. Therefore, if custody is to be denied plaintiff, it must be on the basis that she abandoned the baby to Mrs. R.
The trial judge found specifically that there was no abandonment. Although it might have been argued that plaintiff technically abandoned her daughter, in the light of R.S. 9:6-1 (particularly clause (c) in the statutory language quoted above), counsel for Mrs. R, in the course of oral argument, forthrightly conceded that there was no actual abandonment under the statute or common law. We are also of the view that actual abandonment was not proved. Even where the fact of abandonment is established, that does not necessarily disqualify a parent from being awarded the child's custody. See In re A.B.M., above, 132 N.J. Eq., at page 441, quoting from Winans v. Luppie, above, 47 N.J. Eq., at pages 304-305. The pertinent quotation from the Winans case has been reproduced earlier in this opinion.
The matter therefore resolves itself to a determination of the fundamental question  what is probably for the best interests and well-being of G, who is now 28 months old. We must consider the benefits and detriments that will be visited upon her, resolved in the light of the facts adduced in the Chancery Division.
Plaintiff gave her infant daughter to Mrs. R when the child was only 5 1/2 months old. At the time of the habeas *188 corpus hearing she was 19 1/2 months old. Mr. and Mrs. R therefore had the child for some 14 months. They had apparently given her good care and upbringing and developed a real attachment for her.
Plaintiff had been obliged for a time to board her children with a stranger because she could not rent proper quarters and, further, had to work in order to support them and herself. She ultimately was forced to turn her youngest daughter over to Mrs. R because of her circumstances, and after the latter had repeatedly asked for the child. She now wants to bring all her children under one roof with her.
Plaintiff's economic condition, thanks to welfare grants, is now no worse than that of Mr. and Mrs. R. From the record it appears there would be little, if any, environmental advantage to the baby girl's remaining in the foster home. (Incidentally, we would observe that since the child now shares a bedroom with Mr. and Mrs. R, some other accommodation would soon have to be made  indeed, should already have been made  for as the child grows older, the existing arrangement would become increasingly undesirable.) If the child is given back to plaintiff, she will be a part of her natural family, living with her own mother, sisters and brother in a five-room apartment. She will have the full-time supervision of her mother, who appears to be rearing her children in a proper and healthy manner and in a religious atmosphere.
It is not to be overlooked that plaintiff is 20 years younger than Mrs. R, and thus, all other things being equal, will better be able to cope with the child when she reaches her teens. Mrs. R will be 70 by the time G reaches her majority.
In our case there is not even the impediment, found nonvital, that appeared in In re Judge, above, namely, the child's having a working mother who is forced to have relatives or strangers care for it during the day. Vice-Chancellor Backes in that case resolved a situation somewhat *189 similar to ours. He considered the fact that the child would be cared for by others during the day, and said:
"* * * That may be, but the mother's handicap is the child's misfortune, for which there will be ample compensation, presently in an awakening realization of its real mother's care, and later in life, in the contentment and happiness that will flow to both from the reunion.
And as to the change from the foster parents to the real mother; that will undoubtedly distress the child for a time, but it will not involve its welfare. In its new environment the past will soon be blotted from memory.
Counsel also stresses the concern of the child if, perchance, the mother should be overtaken by protracted illness, or should die, or lose her position. The answer is that like calamity might follow if similar misfortunes should overtake either of [the foster parents]. Their position in life, socially and financially, affords no immunity to possible dire consequences."
So here. Although the return of G to plaintiff may, for a while, disturb the child's peace of mind, that will soon pass, considering her extreme youth and the fact that she will be surrounded by the love and affection of her natural mother, the sisters and brother.
The lack of a father in the M household  a factor which was strongly stressed by the trial judge  creates no different a situation than may be found in any home where the father has died or deserted his family. The fact attested to by sociologists, psychologists and social caseworkers is that a female child as young as G forms its strongest attachments to the mother, at least during childhood and early youth. And though there is no father in the home  at least for the time being  there are sisters and a brother, not found in the R household.
We are, of course, aware of the fact that courts must exercise extreme care in cases of this nature in discharging their parens patriae jurisdiction. Were the child of such an age that she could form or express a rational judgment in the matter, such a choice would be helpful to the court in reaching a conclusion. Cf. In re Hoppe, 32 N.J. Super. 460, 463-464 (Cty. Ct. 1954). However, since G is too *190 young for any such questioning, we shall have to strike a balance on the record as submitted and the principles developed in the cases.
On balance, we conclude that the trial court was in error in awarding the child to Mr. and Mrs. R. Plaintiff's age as against that of Mrs. R, the blood ties that will be strengthened by the child's living with her own family, G's extreme youth and her adaptability to change at this time, the living accommodations in the M home, and the general lack of a definite advantage to the child if she is left with the Rs (except, possibly, for the "father presence"), all point to this conclusion.
The judgment is reversed with the direction that the Chancery Division enter judgment awarding custody of G to plaintiff mother. The judgment should specifically provide that the county welfare agency, or an accredited local social work agency, supervise the custodial arrangement and make regular quarterly detailed reports on home conditions, the child's health and welfare, the mother's habits, conduct and associations, and the attention she is giving to G and generally to the other three children, the financial circumstances of the family, and all other matters which will give the Chancery Division judge a full, accurate and continuing picture of G's care and upbringing. The public agency should also be directed to take all necessary steps to see to it that G's natural father contributes a proper amount for her support and maintenance.