729 A.2d 484 (1999)
321 N.J. Super. 482
Lawrence WATKINS, Jr., Plaintiff-Appellant,
v.
Beverly NELSON and Kevin Nelson, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted December 9, 1998.
Decided May 28, 1999.
*485 Joel C. Seltzer, Union, for plaintiff-appellant.
JoAnne Byrnes, Flemington, for defendants-respondents.
Before Judges LANDAU, BRAITHWAITE and WECKER.
The opinion of the court was delivered by WECKER, J.A.D.
The child who is the subject of this custody dispute was born on August 15, 1996, to Megan Murphy, the seventeen-year-old daughter of defendant Beverly Nelson and step-daughter of defendant Kevin Nelson. The Nelsons have had custody of Chantel Ivonne Watkins-Murphy since she was twelve days old, when Megan died in an automobile accident. Plaintiff, Lawrence Watkins, Jr., is Chanter's biological father. Watkins, who was not married to or involved in a long-term, committed relationship with Megan, has had regular visitation with Chantel since her mother's death.
Watkins appeals from a judgment awarding custody to Beverly and Kevin Nelson. The trial judge concluded that the Nelsons were Chantel's psychological parents; that in a custody dispute between a biological parent and a psychological parent, the child's best interest is determinative, and that it is in Chantel's best interest to remain in the Nelsons' custody, with liberal parenting time for Watkins. Judge Edmund R. Bernhard issued a detailed written opinion on March 11, 1998, applying the correct legal principles to fact findings that are clearly supported by substantial credible evidence. We therefore affirm, substantially for the reasons set forth in Judge Bernhard's opinion.
As Judge Long wrote for this court in Zack v. Fiebert, 235 N.J.Super. 424, 563 A.2d 58 (App.Div.1989), when custody of a minor child is at issue, and the dispute is between a biological parent and another person who has stood in the shoes of a parent and performed as a parent, the custody determination should be made on the basis of the best interest of the child. Of course, the court must engage in a preliminary fact-finding to determine whether the person who seeks custody in opposition to the biological father or mother has in fact acted as a parent to the child in question. That is exactly what Judge Bernhard did.
After a four-day trial, in which he heard the testimony of Carla Knight (Lawrence Watkins, Jr.'s sister), Lawrence Watkins, Sr. and Mildred Watkins (Lawrence Watkins' parents), Lawrence Watkins, Jr., Beverly Nelson, Kevin Nelson, *486 and a psychologist, Dr. Robert Clyman, the judge made detailed findings of fact in support of his legal conclusions, thereby taking the appropriate steps to resolve the dispute before him. First, he recognized the prima facie evidence that then nineteen-month-old Chantel had been living with the Nelsons, her maternal grandparents, for her entire life, since her birth on August 15, 1996, and her mother's tragic death twelve days later. Second, he considered all the evidence to conclude that the Nelsons' role in the child's life placed them in loco parentis, that is, as Chantel's functional and psychological parents. That conclusion is well-supported by the evidence at trial. The judge then applied existing precedent in New Jersey to determine the appropriate standard for resolving contested custody, and concluded that because the Nelsons' role in Chantel's life was akin to that of a parent, the best interest of the child would guide his ultimate decision.
Finally, the judge carefully and thoughtfully weighed all of the facts, most of which are not actually in dispute; analyzed those facts consistent with established custody law, including the non-exclusive factors set forth in N.J.S.A. 9:2-4; and determined that it would be in Chantel's best interest to remain in the "legal and residential custody" of Beverly and Kevin Nelson, with continued, substantial parenting time to be spent with her father, Lawrence Watkins, Jr.[1]
Deference is due the trial judge's factual determinations at two stages: the conclusion that the Nelsons are Chantel's psychological parents, and the conclusion that as between Watkins and the Nelsons, Chantel's best interest requires that custody remain with the Nelsons.
Judge Bernhard was justifiably impressed by the Nelsons' attention to Chantel's special developmental and/or medical needs.
The plaintiff and his family described Chantel as a happy, healthy child. They have administered various medications to Chantel, which the Nelsons have sent with her, but have not had the experience of dealing with any of Chantel's health problems. On the other hand, the Nelsons have had full responsibility of dealing with Chantel's initial infant examinations and normal infant health conditions.
The Nelsons described how they noticed some unusual conditions during Chantel's infancy. They described that she was very "floppy" and that she was unable to turn her face and hold her head up, nor could she turn over at three months. It appeared to them that she had some gross motor delays. They immediately obtained physical assessments and became involved with early intervention. They had Chantel evaluated at the Hunterdon Medical Center in May of 1997 and it was recommended that Chantel would benefit from participation in an early intervention program. The neurological evaluation was done in September 1997 as a result of the initial evaluation. The neurological assessment indicated that the "floppy" observation was a slight degree of hypotonia, meaning she has overly flexible joints. Apart from that, Chantel's growth was reasonably consistent with children of her age. As a result of the hypotonia, Chantel needs continual active stimulation.
The trial judge placed significant weight upon the testimony of the defendants' expert psychologist, describing his findings as follows:
The Nelsons were evaluated by Robert Clyman, Ph.D., a clinical psychologist. *487 His practice involves diagnostic evaluations and family planning. His curriculum vitae demonstrates extensive experience since obtaining his doctorate and post-doctoral work in 1978. The evaluation did not include Lawrence E. Watkins, Jr. as he sought not to be evaluated nor did he desire to participate in court ordered mediation. Dr. Clyman's evaluation included observations of the Nelsons in their "family constellation" with Emily, Jessica, Dorothy and Chantel. He also conferred with various collateral sources, including physical therapists, evaluators of Chantel at the Hunterdon Medical Center and their adopted daughter's Division of Youth and Family Service Manager. Dr. Clyman described the strong family values that he observed. He related how Kevin's foster care experience permitted him to give something back in his relationship with the parties' adopted daughter Dorothy. He was impressed with Kevin's devotion as a father and his interest in his children's experience and concerns. He found Beverly had excellent parenting skills and demonstrated in-family leadership in the "family constellation." He found Chantel to be fully integrated into the Nelson family, that is, not only with Beverly and Kevin, but with Jessica, Emily and Dorothy as well. He described his observations of Chantel with the other children. He described her as the hub of the family wheel, and that she was sitting in the middle of the other children and interacting with them as the outside of the wheel. He was also impressed with Beverly's interaction with the social agencies in dealing with Dorothy's speech and educational progression. He was particularly impressed with her diligent work in dealing with Dorothy's communication skills. He noted that Chantel was somewhat socially regressed. He felt this was a developmental issue. She was happily adjusted, well behaved and easily reacted with her siblings. [emphasis added.]
Dr. Clyman described his contacts with collateral sources, one of whom was Joyce Clark, a physical therapist and Carol Stowe, M.S.P.A., who evaluated Chantel at the Hunterdon Medical Center. The evaluation indicated that Chantel was performing at a six month age level when she was nine months old and as a result of Nelson's observation, she was placed in the early intervention program. Chantel's delays are no longer evident. He attributes this to Beverly Nelson's diligence in placing Chantel in the early intervention program. Dr. Clyman concluded that both parents had been sensitive with regard to Chantel's mother (Megan's) learning developmental problems. They demonstrated specialized knowledge with regard to foster and adopted children and multi cultural issues. He pointed out that the Nelsons are raising a daughter with Hispanic-African American heritage in a Caucasian community, which has lead to a happy integration. He felt that they would be able to integrate Chantel, who was another multi-racial child. He observed affection and bonding between Chantel, the Nelsons and the Nelson's children. He highlighted the social advantages to Chantel of being raised in this multi-experienced family. He concluded that Beverly and Kevin Nelson were highly qualified to serve as custodial parents of Chantel:
Beverly and Kevin's children interacted with her in a lively fashion and spontaneously assumed their roles in helping to care for her. They have accepted her with pride as a member of their family and it is likely that Chantel would experience the deprivation of future contact with them as a significant loss even though she was developmentally unable to demonstrate a special attachment to any of the Nelsons.
The trial judge described the unique family relationships within the Nelson family, including Megan's own background, as *488 a factor contributing to his conclusion that placing Chantel in the custody of the Nelsons was in her best interest. The Nelsons' history included extraordinary efforts to maintain Megan's relationship with her biological father and her legal father, and their extended families, in addition to her step-father, Kevin Nelson.
Beverly Nelson was the biological mother of Megan. Megan lived with Beverly and Kevin Nelson in their home in Holland Township, Hunterdon County. Megan's biological father was one Victor Cruz. Her "legal" father was Mrs. Nelson's former husband, William Murphy, who resided in Cranford, New Jersey. Megan was fortunate to have a relationship with her biological father, legal father and stepfather. During her teen years Megan had an "up and down" relationship with her biological father, legal father, and her stepfather, Kevin Nelson.
Beverly Nelson had a child, Jessica, age 13, as a result of her marriage to [Bob] Murphy. She and her husband Kevin Nelson have a child, Emily, who is 10. She and Kevin adopted a daughter, Dorothy, who is eight. Dorothy is of Hispanic-African American heritage. Dorothy came to the Nelson family as a foster child. It should be noted that the Nelson family was a foster placement family with the Division of Youth and Family Service and at various times they were temporary caretakers of foster children. She and her husband Kevin Nelson have lived in Holland Township for four years with Jessica, Emily and Dorothy.
Where physical custody is contested between parents (or those who stand in loco parentis), it is appropriate to consider, among other factors, whether one of the contesting parties, if granted primary custody and care of the child, is more likely than the other to maintain and encourage the child's relationship with the non-custodial parent. See N.J.S.A. 9:2-4. As the trial judge found,
[Beverly Nelson] was also cross-examined with regard to the racial issues in this litigation. The Watkins family is African American and the Nelsons are not. I thought her answers in response to cross examination were good and demonstrated understanding and maturity. As a result of the Nelsons adoptive daughter Dorothy's multi-racial background, she has demonstrated experience and ability to deal with this issue in a healthy manner so that Chantel will be able to grow up with a knowledge and understanding of her multi-cultural background.
The trial judge began his analysis with an accurate description of the law:
The law has recognized that in a custody dispute between a natural parent and a third person, the parent-child relationship is ordinarily not disturbed unless there is a clear showing of the parents' gross misconduct or unfitness. The courts have tended not to interfere with or deny the natural parent custody to his or her child. In actions between a third party against a natural parent, the law treats this more like a termination action than a custody action between biological parents. "Thus, normally, when a third person seeks custody as against a natural parent the standard should be the termination standard of unfitness. [citations omitted].... The application of this standard is footed [sic] in the presumption in favor of the natural parent's superior right to custody." (citation omitted) Zack v. Fiebert, 235 N.J.Super. 424, 432, 563 A.2d 58 (App.Div.1989).
As the trial judge noted, in Zack we
recognized that this rule cannot be blindly followed in all situations. The Appellate Division stated:
However, where as a preliminary matter, the third party is able to show that he or she stands in the shoes of a parent to the child and thus in parity with the natural parent, he or she *489 should be accorded the status of the natural parent in determining the standard to be applied to the quest for custody. In such circumstances the best interest test should apply. 235 N.J.Super. at 432, 563 A.2d 58.
In this case, Beverly and Kevin Nelson stand in the shoes of their deceased daughter Megan and are in parity with Lawrence E. Watkins Jr., thus the best interest standard should apply. Their status is akin to being a psychological parent as defined in Hoy v. Willis, 165 N.J.Super. 265, 398 A.2d 109, where the court recognized: "there is a serious potential for psychological harm occurring to young children if they are removed from a home where they have lived and been nurtured during their early years by loving and devoted parents...." Hoy v. Willis, 165 N.J.Super. 265, 272, 398 A.2d 109 (App.Div.1978).
[emphasis added.]
The Legislature clearly recognized that where a child's biological parents are not living together when the parent with custody and care of the child dies, the court shall act in the best interest of the child with respect to custody. N.J.S.A. 9:2-5 provides:
In case of the death of the parent to whom the care and custody of the minor children shall have been awarded by the Superior Court, or in the case of the death of the parent in whose custody the children actually are, when the parents have been living separate and no award as to the custody of such children has been made, the care and custody of such minor children shall not revert to the surviving parent without an order or judgment of the Superior Court to that effect. The Superior Court shall have the right, in an action brought by a guardian ad litem on behalf of the children, to appoint such friend or other suitable person, guardian of such minor children, and shall have the right to remove such guardian, and to appoint a new guardian or guardians, and to make such judgments and orders, from time to time, as the circumstances of the case and the benefit of the children shall require.

[emphasis added.]
The court's initial order granting temporary custody of Chantel to the Nelsons was consistent with that statute, as is the final judgment appealed from. Judge Bernhard considered the critical factors the physical and emotional health and well-being of the childand compared the parties' relative abilities to foster Chantel's health and well-being, when he concluded:
The Nelsons are on a parity with Lawrence E. Watkins Jr., therefore the best interest standard applies. The test is, what will protect the safety, happiness, physical and mental and moral welfare of the child. Fantony v. Fantony, 21 N.J. 525, 536, 122 A.2d 593 (1956).
In dealing with the safety issue I find Chantel's safety would be better protected with the Nelsons. The family environment is attuned to the needs of children. The perspicacity of the Nelsons in dealing with Chantel's hypotonia and her slow development and immediately getting her into an early intervention program show their ability to deal with her health issues. I am concerned about the maturity level of Lawrence E. Watkins Jr. He is 20 years of age, just recently graduated from high school. I commented earlier about a question in my mind concerning his high school education. From the history he revealed to the Nelsons that he was a high school dropout and was getting he G.E.D. at nights. This is a better explanation of his educational progress than he gave me during his testimony. The fact that Lawrence E. Watkins Jr. was delayed in obtaining his high school diploma or a G.E.D. is not a significant factor in the totality of the circumstances, but his oinability to face this issue and attempt to obscure his educational background was distressing.

*490 The Watkins' family environment demonstrates a responsible, stable one. However, custody is being sought by Lawrence E. Watkins Jr., and not his family. An issue that arose during the course of the testimony was that shortly his mother and father will be moving to North Carolina upon retirement. Lawrence E. Watkins Jr. does not give me the same sense of responsibility and security as his parents do. He has had limited job experience, has worked at four jobs for no longer than a couple of months each. His maturity is questionable, he would not be able to care for Chantel on his own.
The second factor to be considered is the happiness of Chantel. Testimony by the Nelsons and Watkins indicate that Chantel is happy in each of their households. However, the visitation periods are short in duration and Watkins' family observations are basically "a play atmosphere" with Chantel. Dr. Clyman had an opportunity to observe the Nelson interfamily relationship not only with Beverly and Kevin, but with their three children. His observations and professional conclusions point out that the analysis of this factor weighs heavily with the Nelsons.
I am confident that Chantel's physical and mental welfare will be better protected in the Nelson household. They have already demonstrated an ability to discover problems and immediately deal with them. On the other hand, the plaintiff, although not intending any harm, failed to notice anything concerning Chantel's hypotonia and slow development. Testimony indicated that medicine is sent with Chantel on visitations, but there has never been an inquiry [by Watkins] as to her health or the reasons for the medication. I do note that Lawrence E. Watkins Jr.'s mother did review the material from the early intervention program and she is vitally interested in Chantel's welfare.
The question of Chantel's moral welfare is a more difficult one to evaluate. She is the product of a biracial and mixed religious background. The Nelsons have already bridged the multi-cultural background with their adopted daughter Dorothy, who has Hispanic-African American background and have recognized her needs. The different religious backgrounds [have] already produced conflict; initially, over the christening of Chantel and the Watkins family disapproval of Chantel celebrating Christmas and Easter with the Nelsons. The Nelson have attempted on several occasions to invite both the plaintiff and his family to their house for dinner to promote communication and contact between the families. It has been refused, there has been extremely limited social contact or communication. The Nelsons fear that Lawrence E. Watkins Jr. and his family would discourage contact with the Nelsons and thereby deprive Chantel of access to half of her heritage. This would aversely affect Chantel. Plaintiff's attitude in refusing to participate in mediation demonstrates this fact.
Therefore, I conclude that it is in Chantel's best interest to award custody to Beverly and Kevin Nelson. The current visitation schedule shall remain in effect.
Several compelling cases have held that the child's best interest is the standard for deciding visitation and custody issues between a biological parent and one acting in the role of a parent. As Judge Stern noted in his opinion in V.C. v. M.J.B., 319 N.J.Super. 103, 114, 725 A.2d 13 (App.Div. 1999), where the majority found that the lesbian partner of the children's biological mother was a psychological parent to the children, and that her claims to both visitation and custody must be evaluated under a best interest standard,
In Hoy v. Willis, 165 N.J.Super. 265, 398 A.2d 109 (App.Div.1978), the foster mother had custody and functioned as a *491 psychological parent to the child for approximately four years after a voluntary placement, and the expert testified as to the bonded relationship between the child and the foster mother. We therefore held that the best interests test should apply, and the order returning the child to his biological mother was vacated.6 In Todd v. Sheridan, 268 N.J.Super. 387, 633 A.2d 1009 (App.Div.1993), we also applied a best interests test because the maternal grandparents, who sought custody after the mother's death, were the primary caretakers of the child, were bonded to her and, according to one expert, functioned as the child's psychological parents. We, therefore, reversed the Chancery Division's award of custody to the father. In Palermo v. Palermo, 164 N.J.Super. 492, 497, 397 A.2d 349 (App.Div.1978), where custody was awarded to the child's stepmother, the former wife of the natural father, we noted that New Jersey courts have not "hesitat [ed] to award custody to someone other than a natural parent when the best interests of the child so dictate, even in one case where the natural mother was no longer found to be unfit." See also S. v. H.M., 111 N.J.Super. 553, 270 A.2d 48 (App.Div.1970); S.M. v. S.J., 143 N.J.Super. 379, 363 A.2d 353 (Ch.Div.1976). We similarly conclude that "unfitness" is not the proper test here. Compare Matter of D.T., supra, 200 N.J.Super. at 171, 491 A.2d 7, applying an unfitness standard where the grandparents seeking custody did not allege that they were the child's psychological parents, the child had lived with them for less than one year, and the grandparents could not show why the father should be deprived of custody. See also E.T. v. L.P., supra, 185 N.J.Super. at 81-84, 447 A.2d 572.
6 The foster mother was a paternal aunt who was given custody after the Division of Youth and Family Services obtained "temporary custody" pursuant to N.J.S.A. 30:4C-12.
And as set forth in the separate opinion, concurring on the issue of visitation, in V.C. v. M.J.B., supra,
In reaching the decision that the best interests of the child must drive both visitation and custody disputes between a biological parent and another bonded, psychological parent, I begin, as do my colleagues, by examining the relevant statutes. N.J.S.A. 9:2-3 provides:
[w]hen the parents of a minor child live separately, or are about to do so, the Superior Court, in an action brought by either parent, shall have the same power to make judgments or orders concerning care, custody, education and maintenance as concerning a child whose parents are divorced.... (emphasis added.)
N.J.S.A. 9:2-4 further provides, in part, that:
[t]he Legislature finds and declares that it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy.
In any proceeding involving the custody of a minor child, the rights of both parents shall be equal .... (emphasis added.)
I find the statutory definition of "parent" set forth in N.J.S.A. 9:2-13(f) to be significant: "The word parent, when not otherwise described by the context, means a natural parent or parent by previous adoption." N.J.S.A. 9:2-13(f) (emphasis added). The Legislature did not foreclose the possibility that a person other than a "natural parent or parent by previous adoption" might come within the class of persons referred to as "parents" in N.J.S.A. 9:2-3 and 9:2-4, depending upon "the context." That definition evidences flexibility, not rigidity, consistent with the various family *492 relationships existing in our society today.
[319 N.J.Super. at 126-27, 725 A.2d 13 (Wecker, J., concurring and dissenting).]
As in that opinion in V.C., we "can imagine few circumstances in which a person other than a `natural parent or parent by previous adoption' is better `described by the context' than [the Nelsons]." Id. Also as in V.C.,
I disagree with Judge Braithwaite's reliance upon what he describes as a literal interpretation of the statute defining "parent," and his view that allowing either visitation or custody as sought here by V.C. would constitute a radical departure from current law. Without disavowing Zack, Judge Braithwaite justifies the denial of both custody and visitation on a finding that "the trial court properly concluded that plaintiff was not a psychological parent." He reaches that conclusion by defining "psychological parent" as one whose removal from the child's life "will cause that child severe psychological harm," citing Hoy v. Willis, 165 N.J.Super. 265, 272, 398 A.2d 109 (App.Div.1978), without addressing the evidence that Judge Stern and I each have cited to conclude that V.C. is a psychological parent. Psychological parenthood is a finding based upon the role the person historically has played in the child's life. Neither optimistic nor pessimistic predictions of future harm that would result from ending that role can logically define the role itself.
[Id. at 128-29, 725 A.2d 13 (Wecker, J., concurring and dissenting.)]
Our view here is consistent with Zack v. Fiebert, supra, 235 N.J.Super. at 432-33, 563 A.2d 58, where Judge Long wrote for this court:
[T]here is no single standard applicable in every third party custody case; the standard to be applied depends upon the status of the third party vis a vis the natural parent and the child.
[W]here, as a preliminary matter, the third party is able to show that he or she stands in the shoes of a parent to the child and thus in parity with the natural parent, he or she should be accorded the status of a natural parent in determining the standard to be applied to the quest for custody. In such circumstances, the best interests test should apply. [citations omitted.]
There is ample precedent for granting custody to a psychological parent where that is in the best interest of the child. See Hoy v. Willis, 165 N.J.Super. 265, 398 A.2d 109 (App.Div.1978) (foster mother functioned as a psychological parent and had a bonded relationship with the child). In Hoy we recognized, more than twenty years ago,
Courts have traditionally been reluctant to deny a parent custody of his or her child. However, when the best interests of the child will clearly be served by a custody award to a third party, a finding of either parental unfitness or abandonment is not a prerequisite to the entry of an order doing so.
That there can be a psychological parent-child relationship between a child and someone other than the child's biological parent is well recognized in the literature on the subject. Biological relationships are not an exclusive determinate of the existence of a family.
[Id., 165 N.J.Super. at 272, 398 A.2d 109. (citations omitted).]
In Todd v. Sheridan, 268 N.J.Super. 387, 633 A.2d 1009 (App.Div.1993), Judge Long reiterated the applicability of the Zack best interest test to a custody dispute on facts remarkably similar to those before us:
The Todds next urge that insofar as Zack placed them in parity with Sheridan in the custody dispute over Nicole, *493 he erred in giving any consideration whatsoever to Sheridan's status as Nicole's natural parent. We disagree. The Todds received the benefit Zack was meant to accord them when they were not compelled to prove Sheridan's unfitness in order to obtain custody. That is the full import of Zack. No fair reading of that decision prohibits a judge from considering any aspect of either party's character or status in assessing the best interests of the child. N.J.S.A. 9:2-4. Obviously, as the trial judge recognized, he was not free to give an absolute preference to Sheridan because that would have undermined the salutary aims Zack was meant to accomplish. However, he was free to consider Sheridan's status as Nicole's biological father as one weight in the best interests balance.
[Id. at 398-99, 633 A.2d 1009.]
See also Palermo v. Palermo, supra, 164 N.J.Super. 492, 397 A.2d 349; S.M. v. S.J., supra, 143 N.J.Super. 379, 363 A.2d 353.
The concept of a person standing in loco parentis to a child, and thereby having the status of a parent in respect of custody, has long been recognized. In In re Mrs. M., 74 N.J.Super. 178, 181 A.2d 14 (App. Div.1962), the biological mother of a nineteen month old child sought to regain custody from the couple who had cared for her, at the mother's request, from the age of five months. Although this court reversed the trial court and awarded custody to the mother, it did so based upon a best interests analysis, and not on an automatic preference for the biological parent.
The matter therefore resolved itself to a determination of the fundamental questionwhat is probably for the best interests and well-being of G, who is now 28 months old. We must consider the benefits and detriments that will be visited upon her, resolved in the light of the facts adduced in the Chancery Division.
[Id. at 187, 181 A.2d 14.]
In In re Flasch, 51 N.J.Super. 1, 143 A.2d 208 (App.Div.), certif. denied, 28 N.J. 35, 144 A.2d 736 (1958), this court rejected the grandparents' challenge and awarded custody of orphaned children to their step-mother, who had raised them. The grandparents, not having the same parental relationship to the children, would have had to prove "the moral unfitness" of the step-mother, id. at 18, 143 A.2d 208, because they were not on an equal footing with respect to the children. We emphasized the deference due the trial judge's award:
The trial judge had the advantage of the personal appearance of the parties and of discussions with the children; additionally, he had the wisdom which comes from an accretion of experience in dealing with such matters. Particularly in a case of this nature, is it true that general principles of law do not decide concrete cases, as has been so aptly said. Each matter must be decided on its own merits with the best interests and welfare of the children as the paramount consideration. To this principle, even parental rights must yield.

[Id. citations omitted.]
The dissent relies upon In re D.T., 200 N.J.Super. 171, 491 A.2d 7 (App.Div. 1985), where this court awarded custody to the natural father rather than the maternal grandparents after the death of the child's mother. The family history in D.T. was significantly different from the history before us. There the natural parents were married and lived together with the child until she was almost five years old, when the parents separated. The mother and child moved in with the maternal grandparents, and five months later the mother died as a result of a car accident. Moreover, even the decision in D.T. recognized that parental unfitness or abandonment has not always been a prerequisite to awarding custody to a "third party," and that "other extraordinary circumstances affecting the welfare of the child" might warrant such a decision. Id. at 176, 491 *494 A.2d 7 The record here exhibits just such extraordinary circumstances.
According those persons (other than paid caretakers) who have had actual custody of a child equal status to a contesting biological parent, and thereby requiring a best interest analysis, has been strongly advocated by at least one legal commentator. See Janet Leach Richards, The Natural Parent Preference Versus Third Parties: Expanding the Definition of Parent, 16 Nova L.Rev. 733, 758-62 (1992).
This approach involves a balancing of interests. Society's interest in judicial economy, predictability and the parent's interest in protecting and exercising parental rights must give way to society's and the child's interest in having the most circumspect decision making possible in this all important judgment that cannot help but dramatically affect the child's future. Mr. Justice Black recognized the custody determination as "vital to a child's happiness and well-being."174 A decision of this magnitude should not be determined by concerns for judicial economy and parental rights where these interests are in conflict with a determination of the child's best interests.
[Id. at 766.]
See also Janet Leach Richards, Redefining Parenthood: Parental Rights Versus Child Rights, 40 Wayne L.Rev. 1227 (1994).
"Unfitness" is not the issue here. No one suggests that Watkins is an unfit parent. Rather the trial judge concluded that the evidence showed that it was in Chantel's best interest to remain in the primary care and custody of the Nelsons, while maintaining a strong relationship with Watkins and his family.
In applying the best interest test to a psychological parent's application for custody, we follow the guidance of N.J.S.A. 9:2-4, considering the non-exclusive factors set forth in that statute, and recognizing the "status as ... biological [parent] as one weight in the best interests balance." Todd v. Sheridan, supra, 268 N.J.Super. at 399, 633 A.2d 1009.
The trial judge's conclusion that it is in Chantel's best interest to remain in the custody of the Nelsons is well supported by the evidence, consistent with the factors set forth in N.J.S.A. 9:2-4. Beverly Nelson has been primarily a full-time mother to her three biological daughters, Megan, Jessie and Emily; one adopted daughter, Dorothy; and Chantel. At the time of trial, Jessie was thirteen, Emily was ten, and Dorothy was eight. Although Megan's biological father, Victor Cruz, never played any role in her life, due in part to what was apparently a long-standing substance abuse problem, and has since disappeared, Beverly Nelson maintained contact with his family so that they would know about Megan and she about them. Jessie's father is Beverly Nelson's first husband, Bob Murphy. She has maintained a cordial relationship with Murphy and his second wife and has encouraged Jessie's relationship with her father.
Dorothy was originally placed with the Nelsons as a foster child at the age of thirteen months, and they later adopted her. Dorothy's biological mother was Hispanic and her father African-American, and Beverly Nelson has kept in contact with Dorothy's paternal grandmother, and with her institutionalized biological mother. Beverly and Kevin Nelson were foster parents to several children before Dorothy was placed with them, but since Chantel has been with them, they no longer serve as foster parents.
They have been actively involved with each child's schooling, and particularly so with Megan, who was diagnosed with attention deficit disorder and perceptual problems. They arranged for special classes and later a school work training program for Megan. The Nelsons have been effective advocates for Chantel's special *495 needs, just as they apparently were for Megan. Chantel's medical condition requires high levels of mental and physical stimulation. The Nelsons have seen to exercise classes and swimming for her, and Beverly Nelson has taken seminars to learn to be a better advocate for a child with disabilities. By contrast, Watkins has not evidenced awareness of Chantel's medical condition or special needs.
Beverly Nelson has an associate's degree and at the time of trial had been accepted at Rutgers to complete her college education. She planned to take six hours of course work per semester, pursuing either psychology or social work. She is in good health. Beverly and Kevin Nelson were each born in 1957, and were therefore thirty-nine years old when Chantel was born. Their chronological ages, as well as their parental role with their other children, ranging from thirteen to eight, suggest that they are of an appropriate age to parent a three-year-old.
Beverly Nelson has shown respect for Watkins' relationship with Chantel, and for Chantel's need to relate to her biological father and his family. The record reflects that early in Chantel's life, the Nelsons' invited Watkins to spend more time with her at their home, suggesting that he could sleep over and stay with Chantel in what had been Megan's room. He declined. Beverly Nelson has also recognized Chantel's need to maintain a sense of the cultural, ethnic and religious backgrounds of both families. Although the Nelsons are practicing Catholics, Beverly Nelson has attempted to learn more about the Jehovah's Witnesses, because that is the Watkins family's religion.
Watkins completed his high school education not long before the trial, at about age 20. He had been in a management training program for a distribution center for several months at the time of trial, with no steady employment before that. He was living with his parents and exercising weekend visitation, bringing Chantel to his parents' home and engaging in appropriate activity with her. However, visitation was accomplished by a physical exchange between Watkins' father and one of the Nelsons. Watkins did not himself pick up or deliver Chantel because, as the trial judge found, "he had some disputes with Mrs. Nelson, particularly about some of Megan's personal effects and letters." Watkins' parents have a long-term marriage, steady employment and have lived in their community for many years. At the trial, they acknowledged plans to retire to North Carolina in the not-too-distant future.
We will not interfere with the trial judge's perceptions and conclusions that as between the Nelsons and Watkins, Chantel's best interest will be served by continuing primary custody with the Nelsons, with substantial parenting time for Watkins.
We agree with our dissenting colleague that "the Nelsons never asserted in their pleadings or during their testimony at trial that plaintiff was unfit so as to preclude him from having custody of Chantel .... [and that] no other evidence presented during trial established that plaintiff was an unfit parent." (Dissenting op. at 502, 729 A.2d at 497) But we find no basis for the dissent's assertion that despite the deference due the trial judge's determination that "the Nelsons are Chantel's psychological parents," (Dissenting op. at 502, 729 A.2d at 498) the trial judge "abused his discretion ... in determining that the Nelsons are Chantel's psychological parents." Id. The dissent stresses that "Chantel was only sixteen months old when the trial began and nineteen months old when the judge rendered his decision," id., but ignores the fact that Chantel spent her entire life, from her twelfth day, knowing only Beverly Nelson as her mother and primary caretaker. We can take judicial notice that a nineteen month old has formed a psychological attachment to, and awareness of, her primary parent figure(s). Recognizing the "serious potential for psychological harm ... to young children if *496 they are removed from a home where they have lived and been nurtured during their earlier years," see Hoy v. Willis, supra, does not mean that psychological parenthood is defined solely by proof of such harm.
Nor does the undisputed fact that Watkins has "held himself out to the child as her natural father" affect the conclusion that Beverly Nelson is her psychological mother, and in every way stands in loco parentis to Chantel. Kevin Nelson's role is that of an involved step-father, no different than if Beverly Nelson were Chantel's biological mother, just as in the case of Jessica. The choice of custody between Lawrence Watkins, Jr., and Beverly Nelson is properly based upon the best interest of the child. Contrary to the dissent's assertion, this case is nothing like "a termination of parental rights proceeding" (Dissenting op. at 503, 729 A.2d at 498) and should not be reviewed as if it were.
Nor is this case about children "pick[ing] their parents," or about who can "provide `more or better' things to Chantel," as the dissent suggests. (Dissenting op. at 507, 729 A.2d at 500). Indeed, the trial judge's reasons, amply supported by the record, stress emotional, psychological, and medical factors, particularly the Nelsons' proven ability to maintain each of their children's relationships with all of their blood relatives. Nothing in the judge's decision supports the conclusion that material objects formed the basis for his best-interest determination. The judge expressly discounted Watkins' delay in completing high school "as a significant factor in the totality of the circumstances," but noted some lack of frankness on Watkins' part in regard to his educational history as "distressing." (Op. at 489-90, 729 A.2d at 489). The trial judge appropriately cited Watkins' limited and less than stable work history, by contrast with the history of his own parents, in finding that although his "family environment demonstrates a responsible, stable one ... custody is being sought by Lawrence E. Watkins, Jr., and not his family;" that his parents had plans shortly "to move to North Carolina upon retirement;" and that Watkins "would not be able to care for Chantel on his own."
Our dissenting colleague would apply a bright-line rule, essentially holding that a biological father who is not unfit, and who has maintained a relationship with his child, must be granted sole custody in preference to any other person, including the child's grandparents, who themselves have had the custody and care of the child virtually since birth by reason of the death of her mother. Such an absolute parental preference rule effectively forecloses custody to any other party, even one who has functioned in every way as a parent, unless the biological parent is sufficiently unfit that termination of that parent's parental relationship would be warranted. To adopt such a rule would be a mistake.
We do not suggest that the trial judge has an easy task in a case such as this. It is an awesome responsibility to determine where a child's best interest lies. But the dissent does not recognize the significant precedent in New Jersey's common law for the proposition that the best interest of the child, and not parental unfitness, is the appropriate scale on which to balance the custodial claims of a biological parent against the claim of one, such as a grandparent, who has functioned in every way as a parent. There is no reason to use the unfitness test here, where there is no attempt or intention to terminate the biological parent's relationship with the child. Compare Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (due process requires State to prove unfitness by clear and convincing evidence before terminating natural parents' rights); Stanley v. State of Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (unwed father is entitled to fitness hearing before State takes children from him after death of mother). Indeed, the final judgment here preserves the father-child *497 relationship to which he and Chantel are entitled. We affirm.
LANDAU, J.A.D., concurring.
I concur with Judge Wecker's decision affirming the order of the Family Part principally because this case deals with legal custody under N.J.S.A. 9:2-5, not with the termination of parental rights. I write separately to emphasize that this decision is based on the unique facts of this case, and must not be over-read to suggest that mere apprehension of parental inadequacy or absence of amenities, discussed more fully in Division of Youth and Family Services v. A.W., 103 N.J. 591, 606-607 n. 8, 512 A.2d 438 (1986), constitutes sufficient basis to overcome the presumption that custody in N.J.S.A. 9:2-5 cases should rest with the surviving parent.
As suggested in In re D.T., 200 N.J.Super. 171, 491 A.2d 7 (App.Div.1985), N.J.S.A. 9:2-5 implicitly conveys a presumption that custody be granted to the surviving parent when the custodial parent dies and the parents have been living separately. Nonetheless, the same statute also expressly recognizes that such reversion of custody requires "an order or judgment of the Superior Court", and it gives substantial power to the court to appoint guardians and otherwise to receive input on behalf of the children before entering orders required by "the circumstances of the case and the benefit of the children." The latter words signify that, notwithstanding a presumption favoring the surviving parent, the appropriate legislative standard set for judicial inquiry is the best interests, i.e., "benefit" of the children as required in the circumstances.
Consistent with Todd v. Sheridan, 268 N.J.Super. 387, 398-399, 633 A.2d 1009 (App.Div.1993), the trial judge was not required to give an absolute preference to the biological father in this case, but properly weighed his parentage as a substantial element in the best interests balance, along with all of the other circumstances. As this approach also finds support in Zack v. Fiebert, 235 N.J.Super. 424, 563 A.2d 58 (App.Div.1989), I join with Judge Wecker in voting to affirm.
BRAITHWAITE, J.A.D., dissenting.
I respectfully dissent. The trial judge erred in applying the best interest of the child standard. The correct legal standard in this dispute is parental unfitness. Because this record does not support a finding that the Nelsons are Chantel's psychological parents or that plaintiff is unfit to have custody of his daughter, I would reverse and remand for the entry of a judgment awarding custody to plaintiff.
I note that the Nelsons never asserted in their pleadings or during their testimony at trial that plaintiff was unfit so as to preclude him from having custody of Chantel. Moreover, no other evidence presented during trial established that plaintiff was an unfit parent. Instead, the Nelsons claimed and presented evidence, from the beginning of this litigation,[1] that it was in Chantel's best interest that custody be awarded to them. It was not until December 11, 1997, that trial commenced and not until March 11, 1998, that the trial judge concluded that the best interest standard applied because he determined that the Nelsons "stand in the shoes" of Megan, their deceased daughter. Chantel was only sixteen months old when the trial began and nineteen months old when the judge rendered his decision. At all times, even prior to the Nelson's initial complaint, plaintiff has sought custody of his daughter. Further, plaintiff has always been involved in Chantel's life and has maintained a relationship with his daughter throughout this litigation. *498 I agree with my colleagues that the trial judge is afforded deference at two stages in this custody determination: (1) the determination as to whether the Nelsons are Chantel's psychological parents and, (2) if so, whether Chantel's best interest requires the Nelsons be awarded custody. I believe that the trial judge abused his discretion in the first stage of this analysis in determining that the Nelsons are Chantel's psychological parents.
The trial judge provided the following reasoning for his determination that the Nelsons were Chantel's psychological parents:
Beverly Nelson and Kevin Nelson stand in the shoes of their deceased daughter Megan and are in parity with Lawrence E. Watkins, Jr., thus the best interests standard should apply. Their status is akin to being a psychological parent as defined in Hoy v. Willis, 165 N.J.Super. 265, 398 A.2d 109 (App.Div.1978), where the court recognized: "that there is a serious potential for psychological harm occurring to young children if they are removed from a home where they have lived and been nurtured during their early years by loving and devoted parents...." Id. at 272, 398 A.2d 109. The Appellate Division in the Hoy case discussed the psychological parent and child relationship and referred at length to Goldstein, Freud and Solnit, in Beyond the Best Interests of the Child (1973), and in particular referred to that study:
Where the adult in charge of the child is personally and emotionally involved, a psychological interplay between adult and child will be superimposed on the event of bodily care. Then the child's libidinal interest will be drawn for the first time to the human object in the outside world.
Where there are changes of parent figures or other hurtful interruptions, the child's vulnerability and the fragility of the relationship become evidence. The child regresses along the whole line of his affections, skills, achievements, and social adaptations.
I find from the descriptions of the relationship between the Nelsons and their children that such a relationship exists between Chantel and the Nelson family. I do not mean to infer that there is not love between the Watkins family and Chantel, but there is no such personal and emotional involvement in that family.
My colleagues affirm this determination relying on the "prima facie evidence" that Chantel had been living with the Nelsons for the sixteen months preceding the trial and that the trial judge "considered all of the evidence to conclude that the Nelsons' role in the child's life placed them in loco parentis." Ante at 485, 729 A.2d at 486. Considering that Chantel was only sixteen months old at the commencement of the trial, that plaintiff always held himself out to the child as her natural father, and that no evidence was presented that the child would be harmed by the change in custody, the reasons advanced by the trial judge and affirmed by my colleagues are wholly inadequate to conclude that the Nelson's are Chantel's psychological parents. The finding is not supported by this record.
Accordingly, I conclude that the trial judge erred in applying the best interest standard to this custody dispute between a natural parent and a third party, which is more akin to a termination of parental rights proceeding than a custody dispute between biological parents. See Zack v. Fiebert, 235 N.J.Super. 424, 432, 563 A.2d 58 (App.Div.1989). The standard applied in termination of parental rights cases is one of parental unfitness. Id. at 429, 563 A.2d 58. Parental unfitness is defined as "`intentional abandonment or very substantial neglect of parental duties without a reasonable expectation of reversal of that conduct in the future.'" Matter of Baby M., 109 N.J. 396, 445, 537 A.2d 1227 (1988) (quoting N.J.S.A. 9:3-48c(1)).
*499 Under ordinary circumstances, a custody action by a third party against a natural parent is more like a termination action than a custody action between biological parents. Although visitation may be preserved, such an award destroys any pretense of a normal parent-child relationship and eliminates nearly all of the natural incidents of parenthood including the everyday care and nurturing which are part and parcel of the bond between a parent and child. Thus, normally, when a third party seeks custody as against a natural parent, the standard should be the termination standard of unfitness. The application of this standard is footed in the presumption in favor of the natural parent's superior right to custody.
[Zack, supra, 235 N.J.Super. at 432, 563 A.2d 58 (citations omitted).]
Here, there is no basis to apply a standard other than that applied in termination cases.
The trial judge erred in finding that the Nelsons stand in the shoes of Megan and are thus in parity with plaintiff so that the best interest standard applies. The "standing in the shoes" determination requires a finding that the Nelsons are Chantel's psychological parents. Psychological parents are those persons who have raised and nurtured a child in their home so that if the child was removed from that home "a serious potential for psychological harm" to the child would occur. Hoy v. Willis, 165 N.J.Super. 265, 272, 398 A.2d 109 (App.Div.1978). There is no evidence presented in this record to reach such a conclusion. The Nelsons' expert was not retained to make such a determination, nor did he do so. He was retained to do a "best interest" study and concluded that the Nelsons would make suitable custodial parents for Chantel. Without sufficient evidence that the Nelsons are Chantel's psychological parents, there is no "enhanced status" accorded their right to custody. Zack, supra, 235 N.J.Super. at 433, 563 A.2d 58. Thus, it was error for the trial judge not to apply the unfitness standard.
The right of natural parents to the custody of their minor children is one of the basic rights incident to parenthood. "This right, which recognizes the natural bond of blood and affection between parent and child, is unlike a property right. It has been described as akin to a trust reposed in the parent by the State as parens patriae, for the welfare of the infant." Indeed, the right of natural parents to the custody, care and nurturing of their children has risen to the stature of a fundamental right and deserves special protection. Since the right of parents to the custody of their minor children is both a natural and legal right, the law should not disturb the parent-child relationship except for the strongest reasons and only upon a clear showing of a parent's gross misconduct or unfitness or of other extraordinary circumstances affecting the welfare of the child. Thus, in determining a child's best interest, courts traditionally have been reluctant to deny a natural parent custody of his or her own child.
The strong presumption favoring the natural parent's right to the custody of his or her minor children therefore constitutes judicial recognition that, in most instances, the child's best interests will be maximized by placing the child with his or her natural parent.
[Matter of D.T., 200 N.J.Super. 171, 176-77, 491 A.2d 7 (App.Div.1985) (quoting In re Mrs. M., 74 N.J.Super. 178, 183-84, 181 A.2d 14 (App.Div.1962)) (other citations omitted).]
Based on the evidence presented at trial, plaintiff is entitled to have sole legal custody of his daughter Chantel. The facts and circumstances of this case do not indicate that removing Chantel from the Nelsons' custody will cause serious psychological harm to Chantel. Furthermore, I perceive no great potential for serious psychological harm to Chantel in making the transition from the Nelsons to plaintiff as the custodial *500 parent. Plaintiff has maintained a relationship with his daughter since her birth. He has visited with Chantel in accordance with the prior visitation schedule pending the outcome of this litigation and appeal. The change in custody "may, for a while disturb [Chantel's] peace of mind," but "that will soon pass, considering her extreme youth" and the fact that she has known plaintiff all of her life and maintained a relationship with him during that time. In re Mrs. M., supra, 74 N.J.Super. at 189, 181 A.2d 14.
Moreover, the only reason why there might be difficulty for Chantel because of the custody change is due in large part to the time that passed in resolving this matter at trial. After the death of Chantel's mother, plaintiff informed the Nelsons at the funeral that he would "like to take Chantel into his household." On September 4, 1996, the Nelsons, commenced this action seeking the appointment of a guardian for Chantel. The Nelsons also questioned plaintiff's paternity and sought a determination of that issue. Plaintiff, who had at all times prior to the birth held himself out as Chantel's father and actually assisted in her birth, opposed the action and asserted in his certification, dated September 27, 1996, that he was Chantel's father and wanted custody of his daughter.
On October 8, 1996, a judgment was entered granting temporary guardianship to the Nelsons, "pending the outcome of a custody determination in the Family Part." On the same date, the judge advised the parties that plaintiff had "executed a certificate of parentage in accordance with N.J.S.A. 9:17-41... [which] legally established [plaintiff's] paternity of this child." The custody trial, however, did not begin until December 11, 1997, and concluded on January 14, 1998. This delay should not serve to undermine plaintiff's right to raise and be with his daughter nor undermine Chantel's right to be raised by her natural father.
My colleague, Judge Landau, notes in his concurring opinion that "N.J.S.A. 9:2-5 implicitly conveys a presumption that custody be granted to the surviving parent when the custodial parent dies and the parents have been living separately." Ante at 485, 729 A.2d at 486. My colleague does not go far enough.
I am satisfied that plaintiff, as the natural father, has a right to Chantel's custody, once her mother died. Kridel v. Kridel, 85 N.J.Super. 478, 489, 205 A.2d 316 (App. Div.1964). "`Grandparents are not entitled to the custody of an infant as against the natural father, who has shown no intent to abandon his offspring and who from his past conduct may be expected to bring up the child in accordance with his means and situation in life.'"Id. at 490, 205 A.2d 316 (citation omitted).
But even if Judge Landau is correct that plaintiff only has a presumption that he is awarded custody, then custody should have been awarded to him because the presumption has not been overcome by the Nelsons. "[T]he `best interest' of a child can never mean the better interest of the child." Division of Youth and Family Services v. A.W., 103 N.J. 591, 603, 512 A.2d 438 1986) (citation omitted). A careful reading of the trial judge's decision clearly shows that he made a better interest determination rather than a best interest determination. My colleagues, by affirming that result, have done the same thing.
In this two stage analysis, I think it is absolutely necessary to avoid putting the cart before the horse. Children do not pick their parents. Perhaps the Nelsons were more suitable to provide "more or better" things to Chantel than plaintiff at the time of the trial. Simply put, however, that is not the test. A natural parent should not be denied custody of his child because of his youth or inexperience, when there is no evidence to conclude that these factors will have a detrimental effect on the child. *501 It is clear to me that this decision has been infused with concerns over who Chantel would be "better" off with. I cannot help but wonder whether the trial judge and my colleagues would have reached the same result on the same set of facts if plaintiff and Chantel's mother had been married. I do not believe they would. Nor do I believe they would reach the same result had plaintiff been a little older, had been a little more educated and had a little more money. These factors may vary, but the fact that parent and child share a natural bond is constant.
I would reverse the trial judge's decision.
NOTES
[1] Judge Bernhard's written opinion refers to Watkins having "voluntarily [paid] $25.00 per week for support," and a subsequent order continues that level of child support pending defendant's submitting documentation regarding his past and/or present pay ... [and] his updated CIS within three weeks." The record before us does not reveal any subsequent submissions or proceedings with respect to support.

6 The foster mother was a paternal aunt who was given custody after the Division of Youth and Family Services obtained" temporary custody" pursuant to N.J.S.A. 30:4C-12.
174 Ford v. Ford, 371 U.S. 187, 193, 83 S.Ct. 273, 9 L.Ed. 2d 240 (1962).
[1] As discussed infra, the Nelsons brought a complaint seeking to be appointed Chantel's guardian and contested plaintiff's paternity. This action was commenced on September 4, 1996, when Chantel was less than one month old.